[Civ. No. 19344. First Dist., Div. One. May 28, 1962.]

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Respondent, v. WESTERN AIR LINES, INC., Defendant and Appellant.

108

Darling, Shattuck & Edmonds, Darling, Shattuck, Hall & Call, Hugh W. Darling and Donald K. Hall for Defendant and Appellant.

Dion R. Holm and Thomas M. O'Connor, City Attorneys, William F. Bourne, Public Utilities Counsel, Robert M. Desky and McMorris M. Dow, Deputy City Attorneys, and Harold C. Faulkner for Plaintiff and Respondent.

SULLIVAN, J.—We are called upon to determine whether the plaintiff municipal corporation is entitled to retain, free of any claim of refund, certain charges made against, and paid under protest by, the defendant airline, for the common use facilities provided by the plaintiff at its San Francisco International Airport. The court below rendered judgment declaring that all of said charges, in the agreed amount of $214,385.74, were properly due and owing to the plaintiff and denying recovery of any portion thereof to the defendant upon its counterclaim. The defendant has appealed.

We must examine the controversy before us in the light of its historical setting. Referring to the litigants as City and Western respectively, we first set forth the salient background facts.

The San Francisco International Airport (formerly called the San Francisco Municipal Airport) is located wholly within the adjoining County of San Mateo. It was first opened in 1927, and upon the adoption of the City's new charter in 1932 was placed under the jurisdiction and management of the San Francisco Public Utilities Commission. It is open to all aircraft providing the aircraft qualifies under rules and regulations of the Public Utilities Commission prescribing safety measures.

Air traffic in the early years was understandably limited. Boeing Air Transport, a predecessor of United Air Lines, was the first airline to use the airport, its use of the facilities being confined to a short period in the opening year. Operations of other airlines were, at least until 1932, spasmodic. It was found that between 1932 and 1940 many flights into the San Francisco area could not be completed in bad weather because of the lack of federal aids to air navigation. However two airlines—United Air Lines, hereafter referred to as United, and Transcontinental and Western Air, Inc., later named Trans World Airlines, Inc., hereafter referred to as TWA—the first in 1932 and the second in 1933, inaugurated scheduled air service in and out of the airport. From 1933 until the end of 1943 they were the only scheduled air carriers operating regularly from it. Prior to World War II private

and corporate aircraft owners, so-called itinerary craft from other airports, some charter operations and the United States Coast Guard, which maintained an air station there, used the City's airport but there were no nonscheduled air carriers, no cargo planes and no other users of the facilities with airplanes of the same weight category as those of United and TWA. Prior to 1940, neither United nor TWA leased any land at the airport.

On October 1, 1940, the City entered into a lease with United covering the latter's operations at the airport for a term of 20 years. The lease had been put out to public bid pursuant to the provisions set forth in section 93 of City's charter. United was the only bidder; its bid was accepted and approved. This lease, after a preliminary recital that United was willing to move its western district headquarters from Oakland to the airport, if it could lease certain premises and facilities there, covered 15 acres of land, common use facilities, space in the airport administrative building and provided for the construction by the City on the leased land of extensive capital improvements, the cost of which was to be shared by the City and United on a specified basis.

On October 1, 1942, the City entered into a similar, if less extensive, lease with TWA for a term of 20 years. This lease also had been put out to public bid in accordance with City's charter provisions. TWA was the only bidder; its bid was accepted and approved. TWA's lease covered a specified hangar and adjoining shop space, common use facilities, and space in the airport administration building. Thus each of the two leases, in addition to providing for exclusive use of specific airport premises, also provided for the respective lessee's "use, in common with others authorized so to do, and on the same terms and conditions as apply to others" of so-called common facilities. These facilities are described in identical language in each lease.[1] Each lease provides, in practically the same language, for the payment at identical rates for the privilege of using the foregoing common use facilities.

---

[1]Each lease "demises and lets unto Lessee the use . . . of any and all general facilities . . . including, but without limitation, the landing field, runways, aprons, taxiways, sewerage and water facilities, marker and surface lights, floodlights, landing lights, signals, beacons, aids, control tower, and other conveniences for loading, flying, landings and take-offs; and the causeways, docks, wharves and approaches thereto, parking areas, roads, streets, bridges, spur tracks, and other facilities and appurtenances of said airport, . . . ."

On June 23, 1941, approximately 9 months after the execution of the United lease and 15 months before the execution of the TWA lease, the City's public utilities commission adopted by resolution a schedule of rates "to be charged . . . to commercial air line transportation companies for the use of the airport. . . ." These rates were the same as the rates provided for in the preceding United lease and therefore in the subsequent TWA lease. Indeed the language of the commission's resolution is almost identical with that of the lease. Thus, in net effect, the rates of both leases and of the resolution were the same.

The defendant Western Air Lines, Inc., commenced scheduled operations at the airport on May 1, 1944, pursuant to a certificate of public convenience and necessity granted by the federal Civil Aeronautics Board and a revocable permit issued by the City authorizing use of the common use facilities. Under this arrangement, Western's operations were subject to the above-mentioned 1941 schedule of rates. Thus at such time the rates which aircraft operators paid for the common use facilities were the same for all.

In 1946 the City's public utilities commission adopted by resolution a new schedule of rates to be charged for the common use facilities at the airport which were approximately twice those of the 1941 rate schedule. In the same year the City's charter was amended to permit the public utilities commission to lease airport lands for a period not to exceed 40 years instead of a period not to exceed 20 years. (Charter of the City and County of San Francisco (adopted March 26, 1931, in effect January 8, 1932) § 93, as amended 1946.) The City, through its public utilities commission, thereupon commenced negotiations with United to the end of entering into a new lease for a 40-year rather than a 20-year term. These negotiations extended over a period of six to eight months. There is testimony in the record that the City proposed to United that a higher rate be charged for the additional property United was interested in leasing, such rate to be in conformity with the 1946 schedule of rates, and that all common use facilities charges be eliminated from the new lease. Apparently United, entrenched behind its existing 1940 lease which froze these rates for an additional 15 years, resisted any attempt to eliminate a rate covenant in the new lease being negotiated, although it would, and eventually did, accept the 1946 schedule of rates if they were made a part of the lease.

The new lease was thereafter entered into between the City and United on December 1, 1947, for a term of 40 years. Like the 1940 lease it was entered into pursuant to public bidding procedure. It covered not only the 15 acres exclusively leased under the 1940 lease but an additional 73 acres, approximately, to be held on the same basis, and provided for the use by United of the common use facilities,[2] upon the payment of a schedule of rates the same as the above 1946 schedule with a further provision for the revision of rates at five-year intervals, either upward or downward, but not in excess of 10 per cent of the rates prevailing at the time of the revision. The new lease further provided that the title to the buildings constructed under the 1940 lease would remain in the City and the title to any new buildings and improvements which United might construct would vest in the City upon the termination of the lease. TWA, however, continued to pay the 1941 rates under its existing 1942 lease.

In the meantime Western had attempted to obtain a long-term lease covering the common use facilities at the airport. When these attempts were renewed during 1946, Western's representative was told that the City would not negotiate such a lease because of the pendency of negotiations on the 1947 United lease. After the execution of the United lease, Western, according to the testimony of its vice president, Dominic P. Renda, continued with its attempts but was advised in 1949 by the City's representatives, including its manager of utilities, that it did not appear likely such a lease would be granted. On cross-examination Mr. Renda stated that at the time the negotiations with United were pending, Western was not interested in leasing any undeveloped property at the airport and was not interested at the time of the trial of the instant case. Western's maintenance base was located at the Los Angeles airport with which Western itself had a 30-year contract for common use facilities at rates less than those

[2]The paragraph of the 1947 lease dealing with ''Common Use of Airport and Airport Facilities'' discards the language of the 1941 lease that ''[l]essor further demises and lets . . . the use . . . of any and all general facilities'' and instead provides that ''Lessee shall have the right, license and privilege, subject to the payment of the schedule fees . . . to make use . . . of the Airport and appurtenances, and all facilities, equipment, improvements and services which are or hereafter may be provided at or in connection with the Airport for the common use of those making use of the Airport, including. . . .'' The common use facilities thereafter enumerated are largely the same as those enumerated in the 1940 lease. Notable omissions are: control tower, causeways, wharves.

charged at Los Angeles against other carriers which came later and had no leases.

On November 20, 1950, the City's public utilities commission by resolution, adopted, subject to the approval of the board of supervisors of the City, a new schedule of rates and charges for the use of the facilities and services of the airport. Such schedule proposed an increase of the rates applicable to the common use facilities. It was in turn approved by the board of supervisors on December 18, 1950, by a seven-aye, three-no, and one-absent vote. The new rates went into effect on January 1, 1951. Thus, until 1951, Western and United were both paying the same rates for common use facilities, namely those established by the 1946 schedule, Western because of the direct application of the schedule to its operations, United because of the incorporation of the rates of such schedule in its 1947 lease. TWA, pursuant to its 1942 lease, was still paying rates established by the 1941 schedule and incorporated in such lease. Until 1951, therefore, Western made no protest with respect to the rates charged for the common use facilities.

On August 9, 1954, the City's public utilities commission, by resolution, adopted, and on August 23, 1954, the board of supervisors approved, a new schedule of rates and charges which, insofar as the issues raised before us are concerned, were approximately the same as the rates established by the 1951 schedule. Western made payments under both the 1951 and 1954 schedules whereas United and TWA continued to pay the lower rates set forth respectively in their 1947 and 1942 leases.

The 1951 schedule sowed seeds of litigation. Western objected to it, claiming that the differential between the rates and charges established therein and those paid by United under its lease constituted unjust discrimination. The refusal of Western to pay according to the 1951 schedule resulted in the instant action as we shall hereafter set forth.

At the same time the City advised TWA that it would expect payment for the use of the common facilities in accordance with the 1951 schedule. Faced with a threatened denial of its refueling privileges at the airport, TWA, on February 2, 1951, commenced an action in the United States District Court for the Northern District of California, Southern Division, against the City and the members of its public utilities commission seeking a declaratory judgment that TWA's rates

were fixed by its lease of October 1, 1942, and injunctive relief against the City's action. On July 2, 1954, judgment was rendered in favor of the City, the court holding in effect that the provisions in the lease setting the rates for common use facilities were superseded by the City's 1951 schedule of rates. (*Trans World Airlines* v. *City & County of San Francisco* (N.D. Cal. 1954) 119 F.Supp. 516.) This judgment was reversed by the Court of Appeals ((9th Cir. 1955) 228 F.2d 473, cert. den. (1956) 351 U.S. 919 [76 S.Ct. 711, 100 L.Ed. 1451]) which held that the City was bound by the rate provisions of its lease.

On October 30, 1953, after the trial but before the judgment in the TWA case, the City commenced an action against United in the same United States District Court to recover for common use facilities furnished United upon the theory that charges for the same should be based on the 1951 schedule rather than on United's 1947 lease. After the reversal of City's judgment in the TWA case, the above action against United was dismissed by the court.

The period covered by our narrative was one of constant growth and expansion in the airport's installations, facilities and traffic. This resulted not only from various bond issues approved by the City's voters for the development of the airport but also in part from federal aid funds granted pursuant to various federal acts. In connection with such federal aid, as we shall later consider in more detail, the City made certain assurances that the airport would be operated for the use and benefit of the public, on fair and reasonable terms and without discrimination. There is abundant evidence in the record of the foregoing expansion and development of the airport. For our present purposes, we need single out only a few significant, salient facts: Fixed capital in service increased from $2,982,163.41 for the fiscal year 1939-1940, immediately preceding United's first lease, to $10,044,297.82 in the first postwar (fiscal) year of 1945-1946, to $37,788,653.83 in the fiscal year 1949-1950, immediately preceding the adoption of the 1951 rate schedule, and to $40,854,065.27 in the fiscal year 1950-1951 in which such schedule was adopted. For the same years the number of in and out passengers increased from 126,546 (1939-1940) to 722,408 (1945-1946) to 1,307,307 (1949-1950) and to 1,708,040 (1950-1951). Correspondingly, the number of scheduled movements of air traffic

increased from 17,797 (1939-1940) to 44,483 (1945-1946) to 79,777 (1949-1950) and to 90,794 (1950-1951).[3]

The present action was commenced on February 8, 1952. The City filed a complaint on common counts to recover the increase of rates which Western refused to pay after the effective date of the 1951 schedule together with other items of alleged indebtedness not germane to this appeal. By written stipulation filed in the instant action on August 12, 1955, the litigants agreed that Western would pay to the City under protest the then-accrued unpaid differential between the 1946 and the 1951 and 1954 rates and would continue to pay, under protest, the 1951 and 1954 rates and the City would refund to Western all of the differential in dispute in the event of a final judgment in favor of Western. The parties subsequently agreed that the issues were limited to the charges made against Western for the common use facilities during the period from January 1, 1951, to and including August 31, 1957,[4] and that the amount in controversy was $214,385.74. These issues were raised by amended pleadings of the parties.[5] Western's position was that the charges, being discriminatory, were not only beyond the power of a public utility to exact

[3]Only two scheduled air carriers, United and TWA, operated from the airport during the years 1940 to 1943. By way of comparison, there were 43 or 44 air carriers conducting operations from the airport during the period from January 1954 through September 1957. Scheduled air carriers numbered 16: United, TWA, Western, American Air Lines, British Overseas Airways Corporation, California Central Air Lines, the Flying Tiger Line, Japan Air Lines, Pacific Southwest Air Lines, Pan American World Airways, Quantas Empire Airways, Slick Airways, Southwest Airways, British Commonwealth Pacific Air Lines, Canadian Pacific Air Lines, and Philippine Air Lines. In addition, there were 11 carriers performing scheduled contract services for the Military Transport Service, and 17 nonscheduled or chartered air carriers (these last during the period July 1955 to June 1956).

[4]The parties apparently agreed on this terminal date because of a supplemental agreement entered into between the City and United on August 22, 1957, under the terms of which United agreed as of July 1, 1957, to pay the same rates as the other carriers, thus eliminating differentials except as to the lower rate still being paid by TWA under its 1942 lease.

[5]Upon leave of court granted at the time of the pre-trial conference Western filed an amended answer denying liability together with a counterclaim for recovery of all monies paid by it to the City under protest. On the first day of trial the City filed a supplement to complaint in effect amending its first common count on a book account to allege an indebtedness of $214,385.74. On the sixth trial day the City filed an amended complaint in effect repeating such claim on a book account, and further alleging that the above indebtedness included $16,800 for airport fire protection services.

but were also in violation of the Federal Airport Act and of various assurances given by the City to the federal government that the airport would be operated without unjust discrimination.

We find no disagreement between the parties as to what the term "common use facilities" embraces. It appears clearly from the evidence to include generally the complete landing area, runways, taxiways, the aircraft loading area, the public address system used for flight information, airport lighting facilities, fire protection service and the emergency alarm service. It is also clear that no air carrier has ever been refused the common use facilities of the airport.

The trial court found and concluded that the airport was a public enterprise but not a public utility, that the furnishing of common use facilities there did not constitute a public utility service, that the City had not wrongfully and unjustly discriminated in favor of United and TWA and against Western, that the City had committed no unjust discrimination in violation of the Federal Airport Act or the City's assurances given pursuant thereto, and that the sum of $214,385.74 was legally and properly chargeable to Western, and due and owing to the City. Judgment for said amount, without interest, but with costs, was rendered in favor of the City.

Western contends before us that: (1) The protested rates were illegally and unlawfully assessed and collected, being unjustly discriminatory in violation of the Federal Airport Act and the City's agreements with the federal government; (2) the airport is a public utility and therefore charges made for its common use facilities must be uniform, equal and nondiscriminatory; and (3) the 1951 schedule of rates did not become legally effective and hence the rates billed to Western pursuant thereto were illegally charged and collected. We consider them in the order presented.

*Western has no right of recovery by virtue of the Federal Airport Act or City's agreements with the federal government.*

Western asserts a claim of unjust discrimination on two bases: First, it argues that the Federal Airport Act and various assurances given by the City upon the receipt of federal aid for its airport preclude the exercise on the part of the City of any power to discriminate among air carriers. Secondly, it maintains that the airport is a public utility and, as such, is prevented from prescribing any *unjustly* discriminatory rates and charges.

Over the years, improvements at the airport were in part financed by federal funds and in order to receive them the City was required to give certain assurances to the federal government. Western has directed our attention to several instances of such aid which fall conveniently into two general classifications—those made before, and those made pursuant to, the Federal Airport Act of 1946.

Between 1935 and 1942, City received for use in the development of its airport, substantial WPA funds provided under various federal acts.[6] Upon request of federal officials, City's public utilities commission, on March 8, 1937, passed a resolution (Res. No. 1857) stating in part: "The Public Utilities Commission . . . hereby declares as its policy that said airport will at all times be operated and maintained as a municipal airport for the public benefit, *without unjust discrimination against or in favor of any aircraft operator, including any scheduled airline operator. . . .*" (Emphasis added.) Similar federal funds were received during World War II under the airport project program. As a recipient of aid under this program the City, through its public utilities commission, passed resolutions (Res. No. 4808, January 12, 1942; No. 6182, June 5, 1944) each of which stated as follows: "(d) The City agrees that, continuously during the term of this agreement, the Airport will be operated as such . . . and . . . it will at all times be operated for the use and benefit of the public, on reasonable terms and *without unjust discrimination,* and without grant or exercise of any exclusive right for use of the Airport within the meaning of Section 303 of the Civil Aeronautics Act of 1938." (Emphasis added.)[7] Finally, during the war, as part of the overall settlement of the condemnation action commenced by the United States of America to acquire Treasure Island from the City and for the City's release of all claims thereto, the Army and Navy agreed to construct and complete certain improvements at the San Francisco Airport.[8]

[6]Appellant cites the following statutes: Emergency Relief Appropriation Act of 1936 (49 Stat. 1608), of 1937 (50 Stat. 352), of 1938 (52 Stat. 809), of 1939 (53 Stat. 927), of 1941 (54 Stat. 611), of 1942 (55 Stat. 396) and of 1943 (56 Stat. 634).

[7]Each resolution states that the Civil Aeronautics Administrator "has designated as necessary for national defense a project . . . for development of the San Francisco Airport. . . ." Resolution No. 4808 states that the administrator acts pursuant to the Third Supplemental National Defense Appropriation Act of 1942.

[8]Separate agreements were entered into between the City and the United States acting through the Secretary of the Navy (Navy agree-

118

In each of said agreements, the City agreed that the airport "will at all times be operated for the use and benefit of the public on reasonable terms and *without unjust discrimination* and without grant or exercise of any exclusive right for use of [the Airport] within the meaning of Section 303 of the Civil Aeronautics Act of 1938." (Emphasis added.)

After the war, the City received funds for the development of its airport pursuant to the Federal Airport Act of 1946 (49 U.S.C.A. §§ 1101-1119). Such funds were received during the 10 fiscal years beginning with the year 1948-1949 and ending with the year 1957-1958. The grand total for all years was $6,007,025.86. Both the applicable statute (49 U.S.C.A. §§ 1108, 1110, 1111) and the administrative regulations thereunder (14 C.F.R. §§ 550.1-550.8) required the City as sponsor to submit project applications to, and enter into grant agreements with, the Administrator of Civil Aeronautics. Assurances in writing were required to be given to the administrator (49 U.S.C.A. § 1110, subd. (1)) that "the airport to which the project relates will be available for public use on fair and reasonable terms and *without unjust discrimination.*" (Emphasis added.) The various grant agreements incorporated the respective project applications and provided that the City "shall operate and maintain the Airport as provided in the Project Application. . . ." The project applications in turn contained the following provisions: "3. The Sponsor will not exercise, grant or permit any exclusive right for the use of the Airport forbidden by Section 303 of the Civil Aeronautics Act of 1938, as amended. . . . 4. The Sponsor agrees that it will operate the Airport for the use and benefit of the public, on fair and reasonable terms and *without unjust discrimination.*"[9] (Emphasis added.)

Appellant argues that the foregoing statute, assurances and resolutions not only preclude discrimination but give the air-

ment—March 1, 1944) and the United States, acting through the Secretary of War (Army agreement—March 15, 1944). Said agreements were made a part of the final judgment of condemnation rendered by consent of the parties on April 3, 1944, in the condemnation action pending in the United States District Court in San Francisco.

[9]The project application of May 17, 1948, and its accompanying grant agreement incorporated City's "Sponsor's Assurance Agreement" which contained not only the above provision on unjust discrimination but also provided that, subject to an exception not applicable, "the sponsor will permit all qualified operators, on reasonable terms and *without unjust discrimination,* to use the airport for any aeronautical business or operation up to the capacity of the airport," (Emphasis added.)

line discriminated against the right to recover the differential in rates. Although appellant claims that the protested rates were in violation of all the City's agreements summarized above, it is apparent that its alleged right of recovery is predicated principally on the Federal Airport Act and the City's assurances given pursuant thereto. We shall therefore consider this aspect of the argument first, and then the City's earlier agreements.

At the outset we find nothing either in the Federal Airport Act itself or in the assurances required and given thereunder specifically conferring on Western a right to recover excessive airport charges. The act provides for the recovery by the Civil Aeronautics Administrator of payments made in excess of the United States' share of the total project costs and of certain advance payments for which the United States has received no benefit. (49 U.S.C.A. § 1113.) It also prescribes criminal penalties for false statements, representations and reports. (49 U.S.C.A. § 1118.) We find no other provision permitting recovery by the administrator and no provisions at all giving any right of recovery to any other person. An examination of the act as a whole discloses that its purpose is to promote a nationwide system of public airports (see 49 U.S.C.A. § 1102) and not to regulate airport operations.[10]

The various assurances and agreements required from the sponsor, in this case City, under the act are pro-

---

[10]Every expression of the intent of Congress in enacting the Federal Airport Act of 1946 and the various amendments thereto indicates that the purpose of the legislation is to establish a nationwide system of public airports adequate to meet the present and future needs of civil aeronautics by providing for the development and improvement of civilian airports with federal financial aid in accordance with a national airport plan. (49 U.S.C.A. § 1103; House Report No. 1570, March 16, 1948, 1948 U.S. Code Congressional Service, p. 1469 at pp. 1469, 1471; House Report No. 2709, July 24, 1950, 1950 U.S. Code Congressional Service, p. 3945, at pp. 3945-3946; House Report No. 93, March 2, 1959, 1959 U.S. Code Congressional & Administrative News, p. 1705 at p. 1707; Senate Report No. 654, August 1, 1961, 1961 U.S. Code Congressional & Administrative News, p. 2707 at p. 2710; House Report No. 728, July 18, 1961, 1961 U.S. Code Congressional & Administrative News, p. 2737 et seq. Cf. House Report 701, July 22, 1959, 1959 U.S. Code Congressional & Administrative News, p. 2065, at p. 2066.) Nothing in the above-cited expressions of legislative purpose, or in any other legislative history materials, manifests an intent, either express or implied, to provide users of the airports receiving aid with a private remedy for alleged discrimination. (Cf. 1949 U.S. Code Congressional Service, pp. 1601, 1811, 1813, 2208, 2279; 1955 U.S. Code Congressional & Administrative News, p. 2599.)

motive of such general purpose. The granting agreement in each instance entitles the administrator to recover all grant payments made where there has been any misrepresentation or omission of a material fact by the sponsor. We find no other provision for recovery of funds by the administrator and none whatsoever permitting recovery of money or excess rates by a private party. Indeed the language of the granting agreement itself appears to us to point up that it is simply and entirely a financial arrangement between two parties. As the agreement states, it constitutes "the obligations and rights of the United States and the Sponsor with respect to the accomplishment of the Project. . . ." This echoes the language of the statute (49 U.S.C.A. § 1111).

None of the documents under consideration confers on Western the rights of a third-party beneficiary. The various contracts and assurances created benefits and detriments as between only two parties—the United States and the City. Nothing in them shows any intent of the contracting parties to confer any benefit directly and expressly upon air carriers such as the defendant. It is true that air carriers, including Western, may be *incidentally* benefited by City's assurances in respect to nondiscriminatory treatment at the airport. They may also be incidentally benefited by the fact that, through federal aid, a public airport is improved with longer runways, brighter beacons, or larger loading ramps, or by the fact a new public airport is provided for a community without one. The various documents and agreements were part of a federal aid program directed to the promoting of a national transportation system. Provisions in such agreements, including the nondiscrimination clauses, were intended to advance such federal aims and not for the benefit of those who might be affected by the sponsor's failure to perform.

To recover as a third-party beneficiary, one must show that the contract in question was made expressly for his benefit. (Civ. Code, § 1559; *Shutes* v. *Cheney* (1954) 123 Cal. App.2d 256, 262 [266 P.2d 902].) While it is not necessary that the third party be specifically named as a beneficiary and that "expressly" means "in an express manner; in direct or unmistakable terms; explicitly; definitely; directly" (*Le Ballister* v. *Redwood Theatres, Inc.* (1934) 1 Cal.App.2d 447, 448 [36 P.2d 827]; *Watson* v. *Aced* (1957) 156 Cal.App.2d 87, 92 [319 P.2d 83]), nevertheless, as stated in *Shutes* v. *Cheney, supra,* "an intent to make the obligation

inure to the benefit of the third party must have been clearly manifested by the contracting parties. [Citation.] ■ Where a contract incidentally benefits a third person but is not expressly made for his benefit, he cannot recover thereon. [Citations.]" (P. 262.) ■ Moreover, "[a] promisor bound to the United States . . . by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless, . . . an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences. . . ." (Rest., Contracts, § 145.) (See also *Town of Ukiah* v. *Ukiah Water & Imp. Co.* (1904) 142 Cal. 173, 178-180 [75 P. 773, 100 Am.St. Rep. 107, 64 L.R.A. 231].)

Appellant urges that the above rule of the Restatement is intended to apply only to promisors who are private persons, citing the *Ukiah* case, *supra*. No such principle is announced in *Ukiah*. Nor is any such intention apparent in the above section 145 of the Restatement of Contracts. The only limitation in such section as to the class of the contracting parties is that the *promisee* be a governmental body. If it had been intended to restrict the application of the rule to nongovernmental *promisors*, such limitation would and easily could have been imposed. Private persons on the one hand and governmental units acting in a proprietary capacity on the other are not such disparate promisors as to require us to read into the rule a restriction it does not express.

■ The main thrust of Western's argument is aimed past the parry of no specific statutory authority and no enforceable third-party beneficiary claim. The Federal Airport Act, appellant argues, commands nondiscriminatory treatment of airport users by the recipients of federal aid, and therefore the violation of such mandate on the part of the airport, creates, by implication, an actionable civil right in the airport user which can sue for the resulting harm. Western places principal reliance on the case of *Northeast Airlines, Inc.* v. *Weiss* (Fla.App. 1959) 113 So.2d 884, cert. den. (Fla.S.Ct. 1959) 116 So.2d 772, and cites additional cases as supporting analogues.

122

The facts of the *Northeast Airlines* case are strikingly similar to those of the case before us. In an action against the port authority having jurisdiction over the Miami airport, also developed and improved by federal funds under various acts of Congress, the plaintiff air carrier complained that it was charged rates and fees which were in excess of those charged its competitors National Airlines and Eastern Air Lines for the same services. The rates charged plaintiff were levied pursuant to resolution of the authority, whereas the lower rates charged its two competitors had been established prior thereto by lease agreements. Northeast sought an injunction and refund of the excess charges apparently relying on, among other bases, the Federal Airport Act of 1946 (49 U.S.C.A. § 1110). On the defendants' motion to dismiss, the trial court held that, since the plaintiff had not exhausted available administrative remedies, the suit was presented prematurely and rendered an interlocutory order requesting plaintiff to file its complaint with the Civil Aeronautics Administration or have its complaint dismissed. This order was reversed by the Florida District Court of Appeal which held that "the equity court had jurisdiction of the cause, and that it was not to be deprived thereof either because of the doctrine of exhaustion of administrative remedies, or the doctrine of primary jurisdiction." (113 So.2d, p. 887.) This was the only question in the case and the limit of the appellate court's holding. Contrary to appellant's contention, the court did not consider, much less decide, that a violation of the above section of the Federal Airport Act created a civil right of action in the plaintiff airline. We find the case unacceptable as persuasive authority.[11]

---

[11]In *Aerovias Interamer. De Panama* v. *Board of County Comrs.* (D.C. Fla. 1961) 197 F.Supp. 230, 14 foreign and 4 domestic airlines brought an action for injunctive relief and recovery of overcharges against the same port authority as operator of the Miami International Airport. The basis of the action was that the airport charged foreign airlines higher rental and service rates for its facilities than rates charged domestic airlines. The original complaint alleged that the action was based on the Federal Airport Act (49 U.S.C.A. § 1110), the Federal Aviation Act (49 U.S.C.A. § 1301), the Surplus Property Act (50 U.S.C.A. § 1622) and upon alleged violations of certain treaties (Chicago Convention) and of certain service agreements entered into between the United States and the countries of domicile of the plaintiffs. The complaint was dismissed as to the domestic airlines and the action proceeded to trial as to the remaining foreign airline plaintiffs on the sole legal theory of the violation of the above treaties and agreements. Although the reason for the court's action is not disclosed by the opinion, it appears that no

We turn to appellant's additional authorities. First we are referred to several federal cases, four of which are opinions of the Second Circuit. While they are undoubtedly sound statements of legal principle, they are not helpful to appellant. All of them involve situations which, to use the language of Judge Learned Hand in one of them, *Reitmeister* v. *Reitmeister* (2 Cir. 1947) 162 F.2d 691, 694, fall "within the doctrine which, in the absence of contrary implications, construes a criminal statute, enacted for the protection of a specified class, as creating a civil right in members of the class, although the only express sanctions are criminal."

Thus in *Fitzgerald* v. *Pan American World Airways* (2 Cir. 1956) 229 F.2d 499,[12] an internationally known singer and two of her companions, all Negro airline passengers, brought an action for damages for unjust discrimination, because of their race or color, in violation of 49 U.S.C.A. section 484, subdivision (b), a provision of the Civil Aeronautics Act of 1938 proscribing unjust discrimination. The passengers alleged that although holding reservations, they were prevented from continuing their flight because of their race or color. The pertinent act, so far as applicable, provided for both criminal penalties and administrative remedies. As to the first, 49 U.S.C.A. section 622, subdivision (a) made it a federal crime knowingly and wilfully to violate designated sections of the act including section 484, subdivision (b). As to the second, 49 U.S.C.A. section 642, subdivisions (a), (b) and (c) provided for the administrative process before the Civil Aeronautics Board of complaint, investigation and order of compliance. The Court of Appeals, reversing dismissal by the District Court, held that since the act made it a federal crime to violate section 484, subdivision (b), which proscribed discrimination, the violation of such section created an actionable civil right in the plaintiffs as members of a class for whose benefit the statute was enacted.[13]

---

plaintiff was able to state a cause of action under the Federal Airport Act. "[N]either the diverse Federal Statutes relied on by the plaintiffs, nor the restrictions contained [in a certain deed] . . . gave a right to any of the plaintiffs to sue." (197 F.Supp. at page 236.)

[12]Appellant claims that the *Fitzgerald* case supports the *Northeast Airlines* case. The latter case relied on *Fitzgerald* only in support of the proposition that the doctrine of primary jurisdiction was not applicable.

[13]For a further application of this principle see *Wills* v. *Trans World Airlines, Inc.* (S.D. Cal. 1961) 200 F.Supp. 360, in which the civil right of action was upheld on behalf of an airline passenger "bumped" off an oversold flight though having priority of reservation.

Three other cases of the Second Circuit cited in *Fitzgerald* are also relied upon by appellant, as well as one case from the Fifth Circuit. As we have pointed out, they involve the same principle applied to other federal statutes. In *Reitmeister* v. *Reitmeister, supra,* (2 Cir. 1947) 162 F.2d 691, the court held that the Communications Act of 1934, 47 U.S.C.A. section 151 et seq., imposed a civil as well as a criminal liability although the statute made no provision for the former. In *Fischman* v. *Raytheon Mfg. Co.* (2 Cir. 1951) 188 F.2d 783, it was held that although section 10, subdivision (b), of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78a et seq.) did not explicitly authorize a civil remedy, it did create one since it made unlawful the conduct which it proscribed and since there was also an indication that Congress had always assumed that private actions were available under the statute. In *Goldstein* v. *Groesbeck* (2 Cir. 1944) 142 F.2d 422, the plaintiff, a minority stockholder of certain operating companies, brought a shareholder's derivative action against certain holding companies and their officers charging that contracts had been made in violation of section 4(a)(2) of the Public Utility Holding Company Act of 1935 (15 U.S.C.A. § 79d, subd. (a)(2)). The proscribed conduct was made unlawful by the act which provided specific sanctions in the form of injunctive relief, criminal penalties and declaring the contracts void. The court upheld a private right of action upon the ground that the operating companies were members of a class for whose ultimate protection the legislation was intended.

Two other cases cited by appellant are to the same general effect. In *Laughlin* v. *Riddle Aviation Co.* (5 Cir. 1953) 205 F.2d 948, the court permitted recovery by an airline pilot of wages at the higher rates prescribed by a decision of the National Labor Relations Board and adopted by the Civil Aeronautics Act on the ground that the plaintiff was obviously one of the persons for whose benefit the statute was enacted, even though no civil remedy was specifically provided therein. The case of *Texas & New Orleans R.R. Co.* v. *Brotherhood of Railway etc. Clerks* (1930) 281 U.S. 548 [50 S.Ct. 427, 74 L.Ed. 1034], held that an enforceable civil right for an injunction existed for violation of section 2, subdivision 3, of the Railway Labor Act of 1926. Such section in effect provided that representatives of management and labor should be selected without interference, influence or coercion by either

party over the other. Interpreting all of the act as a whole, in the light of prior legislation in the field, the court concluded that it was the intention of Congress in prohibiting the above conduct, to create a legal right in each labor group even though no statutory penalty was prescribed for the prohibited acts.

The case before us does not fall within the above doctrine. Neither section 11 of the Federal Airport Act of 1946 (49 U.S.C.A. § 1110) nor any other section of such act indicates an intention to benefit or protect the class of airline users of airport facilities. No section of the act prohibits unjust discrimination or makes it unlawful. No section of the act makes it a federal crime to breach or violate the written assurances against unjust discrimination required by section 11. As we have pointed out, the criminal penalties of the act apply only to the making of false statements and reports. We can find no basis, therefore, for concluding that an actionable civil right is created for an airline as a member of a class for whose protection the statute was enacted.

The case of *Allen* v. *Hussey* (1950) 101 Cal.App.2d 457 [225 P.2d 674], also cited by appellant, does not support the proposition which appellant urges. In the *Allen* case leases made by an irrigation district to the defendant Hussey covering an airport and adjacent property, including one lease for a term of 34 years at a rental of $1 a year, with an option to renew for an additional 35 years, were held invalid as being contrary to public policy, in breach of trust and in violation of a WPA sponsor's agreement executed by the board of directors of the district agreeing that the airport would not be leased to a nonpublic agency or private individual. The leases were held cancellable upon suit brought by any property owners of the district who were the beneficiaries of the public trust. The case does not hold that a private legal remedy is created by the statute involved.

Finally we return to the earlier federal grants in aid received by the City before the Federal Airport Act. Our examination of the various resolutions of City's public utilities commission and of the so-called Army and Navy agreements entered into upon the transfer of Treasure Island fails to disclose any intention on the part of the contracting parties that the assurances therein contained with reference to unjust discrimination were made for the express benefit of aircraft operators. What we have said with respect to the enforce-

126

ability by third parties of the assurances given under the Federal Airport Act is applicable here. We find nothing creating an enforceable third party beneficiary claim or a right of recovery in aircraft operators for breach of the assurances.

We hold, therefore, that neither the Federal Airport Act of 1946 nor any of the assurances or agreements given by City under said act or other acts created any cause of action in Western for any alleged unjust discrimination and that the conclusion of the trial court to such effect was proper and must be sustained.

*The airport is a public utility.*

 We proceed to determine whether appellants' claim of unjust discrimination can be asserted on the basis that the airport is a public utility whose rates and charges under acceptable legal principles must be uniform, equal and non-discriminatory.

The court below, as we have pointed out, concluded that it was a public enterprise but not a public utility and that the common use facilities thereat did not constitute a public utility service. The issue, involving no evidentiary conflict, presents a question of law.[14]

We begin with the San Francisco Charter. In our view, a fair reading of the applicable provisions of the City's organic law shows an intent to designate and establish its airport as a public utility. Section 120 of the charter provides for the creation of a public utilities commission. Section 121 provides as follows: ''The public utilities commission shall have charge of the construction, management, supervision, maintenance, extension, operation and control of *all public utilities* and other properties used, owned, acquired, leased or constructed by the city and county, *including airports*, for the purpose of supplying any *public utility service* to the city and county

---

[14]Interestingly, City in its original complaint alleges that its charter confers jurisdiction in the public utilities commission ''to manage all public utilities . . . including the San Francisco Airport.'' This allegation was incorporated into City's supplement to complaint but omitted from its amended complaint. The record is not clear that, as respondent states, the trial court found as a matter of fact that the airport is not a public utility. By virtue of a general finding, the court found *inter alia* that the denials in paragraph III of defendant's amended and supplemental answer were untrue, defendant *denying* in such paragraph ''that the San Francisco Airport is a public utility by virtue of plaintiff's Charter, or otherwise.'' The above does not affect our statement *supra* that the question is one of law.

and its inhabitants, to territory outside the limits of the city and county, and to the inhabitants thereof." (Emphasis added.) Section 122 provides: "The San Francisco municipal railway, the San Francisco water department, the Hetch Hetchy project until the completion thereof when it shall be merged with the water department, *the airport,* and *any other public utility* hereafter acquired, shall each be designated as a department under the commission, . . ." (Emphasis added.) Finally, if further confirmation be required, we have the following language of section 125: "The public utilities commission shall have jurisdiction over the *airport* now being conducted by the City and County of San Francisco, as well as over any other airport which said city and county may hereafter acquire, maintain or operate." (Emphasis added.) The above sections read as a whole convince us that the charter intended to make the airport a public utility and to place it under the jurisdiction of City's public utilities commission to be managed and operated as such.

Our views are not unsettled by respondent's interpretation of the above sections, which we find unconvincing. City argues that under section 121 a distinction is made between "public utilities" and "other properties used, owned, acquired, leased or constructed by the city and county, including airports, for the purpose of supplying any public utility service. . . ." We discern no intent to create distinct categories of properties but simply, by the use of comprehensive language, to place under the jurisdiction of the commission all utilities and property used in supplying utility service.

Whatever force City's argument might have if section 121 stood alone, is dissipated when the section is read together with section 122, which refers to "the airport, and any other utility. . . ." City's further contention that the airlines, rather than City itself, furnish the public utility service of transportation at its airport completely ignores the heart of the issue. The city furnishes a public utility service to the airlines, which in turn serve the public as utilities. (*Richfield Oil Corp.* v. *Public Util. Com.* (1960), *infra,* 54 Cal.2d 419, 431 [6 Cal.Rptr. 548, 354 P.2d 4], cert. den. 364 U.S. 900 [81 S.Ct. 233, 5 L.Ed.2d 193].)

In its construction of section 122 City then advances the theory that, in turn, such section provides for two categories (a) public utilities and (b) entities, which are not public utilities, giving as an example of the latter, the Hetch Hetchy

project. The obvious aim of City's theory is to remove the airport from the first class and place it in the second. It is to be noted that the sole possible member of the second category posited by City is the Hetch Hetchy project; City furnishes us with no authority that such project is *not* a public utility. Quite apart from this, however, it appears to us to be a reasonable construction of section 122 that the framers of the charter treated all entities therein listed, including the airport, as public utilities. City adverts to other language of section 122 pertaining to the creation of bureaus for handling matters "that do not pertain exclusively to any one utility or department" and urges that the use of the word "department" shows that the charter did not intend the activities listed therein be declared public utilities by placing them under the jurisdiction of the public utilities commission. This argument ends in futility for City when we consider that the San Francisco Municipal Railway and the San Francisco Water Department, both of which City concedes to be public utilities, are also designated as departments. (§ 122.)

In its proffered construction negating public utility status for the airport, City takes the position that, if section 122 be conceded to declare the airport a public utility, the portion of section 125, quoted by us *supra,* stating that the commission shall have jurisdiction of the airport, is superfluous. We do not agree. Section 125 deals with the subject of employment of personnel and in effect states that while airports shall be under the jurisdiction of the commission, all airport employees, except the manager, shall acquire civil service status and be thereafter governed by the civil service provisions of the charter. Finally, City argues that where the charter intends to declare an activity a public utility, the expression of its intent is unequivocal as in section 121 which states: "Foreign trade zones, as may be authorized by acts of Congress to be located in the city and county, are hereby declared to be public utilities within the meaning of this charter." The absurd result of such reasoning would be that the charter would reflect no intent to create any public utilities other than foreign trade zones, and City would be forced to conclude that the municipal railway and the water department had not been unequivocally established as public utilities.

In addition, City's public utilities commission when establishing rates for the common use facilities at the airport did so pursuant to section 130 of the charter which grants author-

ity to the commission to fix, change and adjust rates, charges and fares of public utilities. The commission, for example, in its resolutions establishing the 1951 and 1954 schedule of rates, referred to by us earlier, obviously took such action pursuant to section 130 and further resolved that the schedules be submitted to City's board of supervisors "as required by Section 130 of the Charter."[15]

In essence, a public utility is the dedication of property to a public use. The much cited case of *Allen* v. *Railroad Com.* (1918) 179 Cal. 68 [175 P. 466, 8 A.L.R. 249] contains the classic statement of principle: " 'What is a public utility . . .? In its broadest sense everything upon which man bestows labor for purposes other than those for the benefit of his immediate family, is impressed with a public use. . . . What differentiates all such activities from a true public utility is this, and this only: That the devotion to public use must be of such character that the public generally, or that part of it which has been served and which has accepted the service, has the right to demand that that service shall be conducted, so long as it is continued, with reasonable efficiency under reasonable charges. Public use, then, means the use by the public and by every individual member of it, *as a legal right.* Such is not only the accepted significance of the phrase by the great weight of authority . . . but is the definition repeatedly announced by this court.' " (Pp. 88-89.) (See also *Richfield Oil Corp.* v. *Public Util. Com.* (1960) 54 Cal.2d 419, 430-435 [6 Cal.Rptr. 548, 354 P.2d 4], cert. den. 364 U.S. 900 [81 S.Ct. 233, 5 L.Ed.2d 193]; *Cudahy Packing Co.* v. *Johnson* (1939) 12 Cal.2d 583, 586 [86 P.2d 348].)

City's airport conforms to this traditional concept. It is beyond question a public airport—indeed an international airport—serving the general passenger public without reservation or restriction. In respect to the problem at hand, it also serves that segment of the public engaged in operating aircraft; that is, operators of scheduled airlines, nonscheduled carriers and private aircraft. The common use facilities of the airport are available for, held out to, and enjoyed by all such operators. Such operators are the customers or patrons

---

[15]It is also significant that in the case of *Trans World Airlines* v. *City & County of San Francisco, supra,* the City took the position both before the United States District Court and the Court of Appeals that the San Francisco airport *was* a public utility. (119 F.Supp. 516; 228 F.2d 473.)

of the airport. No air carriers properly certified under federal law are excluded. No carrier or aircraft using the airport is refused its common use facilities. It is clear to us that such common use facilities constitute a public utility service.

 The fact that the number of those using or enjoying the above public utility service, namely the operators of aircraft, is by circumstance relatively limited, does not destroy the public character of the service. (*Terminal Taxicab Co.* v. *Kutz* (1916) 241 U.S. 252, 255 [36 S.Ct. 583, 60 L.Ed. 984]; *Camp Rincon Resort Co.* v. *Eshleman* (1916) 172 Cal. 561, 563-564 [158 P. 186]; *Ford Hydro-Electric Co.* v. *Town of Aurora* (1932) 206 Wis. 489, 496-497 [240 N.W. 418].)

 Our conclusion that the airport is a public utility and its common use facilities are a public utility service is consonant with recognized authority (see 12 McQuillin, Municipal Corporations, § 35.04 at pp. 571-573; § 35.06 at p. 584) and decisions of other states.[16] We have not been referred to any cases, nor have any been found, holding that a municipally owned airport is *not* a public utility.[17]

City has attempted to negate this public utility status of its airport on a number of grounds, all of which we find untenable. Its basic argument is that in the absence of a declaration that a particular enterprise is a utility by Constitution, statute or other applicable law, such enterprise will not be deemed a public utility even though involving services avail-

---

[16]There is respectable authority holding that a municipally owned airport is a public utility, independent of any constitutional or statutory declarations to that effect. *Price* v. *Storms* (1942) 191 Okla. 410, 412 [130 P.2d 523]; *Ex parte Houston* (1950) 93 Okla. Crim. 26, 58 [224 P.2d 281] (on rehearing), at p. 71 (dictum); *State* ex rel. *Chandler* v. *Jackson* (1929) 121 Ohio St. 186, 187-188 [167 N.E. 396]; *City of Toledo* v. *Jenkins* (1944) 143 Ohio St. 141, 149-150 [54 N.E.2d 656]; *Jones* v. *Keck* (1946) 79 Ohio App. 549, 553 [74 N.E.2d 644]; *State* ex rel. *Helsel* v. *Board of County Comrs.* (Ct. Com. Pleas 1947) 37 Ohio Op. 58 [79 N.E.2d 698, 703], affd. (1948) 83 Ohio App. 388 [78 N.E.2d 694], *appeal dismissed* (1948) 149 Ohio St. 583 [79 N.E.2d 911]; cf. *State* ex rel. *Hile* v. *City of Cleveland* (1927) 26 Ohio App. 265, 266 [160 N.E. 241]; *State* ex rel. *City of Lincoln* v. *Johnson* (1928) 117 Neb. 301, 303-304 [220 N.W. 273].

[17]It is worthy of note that in *Trans World Airlines* v. *City & County of San Francisco, supra,* 119 F.Supp. 516, the U.S. District Court concluded that the very common use facilities involved in the instant case were offered by the San Francisco airport as a public utility service. Although reversing the District Court, the Court of Appeals did *not* hold that the airport was not a public utility or that the above facilities were not a public utility service. (*Trans World Airlines* v. *City & County of San Francisco* (9 Cir. 1955) 228 F.2d 473, cert. den. (1956) 351 U.S. 919 [76 S.Ct. 711, 100 L.Ed. 1451].)

able to the public generally. However, in support of its argument, City cites cases dealing with utilities subject to the California Public Utilities Commission. Such commission, of constitutional origin, has jurisdiction over some public utilities. (Cal. Const., art. XII, §§ 22-23; Pub. Util. Code §§ 201-2113, 2501-2728, 2901-2976.) It does not and conceivably could not have jurisdiction over a municipally owned public utility. "In the absence of legislation otherwise providing, the [California Public Utilities] commission's jurisdiction to regulate public utilities extends only to the regulation of *privately* owned utilities." (*Los Angeles Metropolitan Transit Authority* v. *Public Util. Com.* (1959) 52 Cal.2d 655, 661 [343 P.2d 913]; emphasis added.) Unless the enterprise or activity in question is a public utility as defined in the Constitution or Public Utilities Code, it is not subject to the jurisdiction of such commission. (*Television Transmission* v. *Public Util. Com.* (1956) 47 Cal.2d 82, 84 [301 P.2d 862].) Respondent's cases therefore (City cites *inter alia: Television Transmission* v. *Public Util. Com., supra; Richfield Oil Corp.* v. *Public Util. Com., supra,* 54 Cal.2d 419; *Pajaro Valley Cold Storage Co.* v. *Public Util. Com.* (1960) 54 Cal.2d 256 [5 Cal.Rptr. 313, 352 P.2d 721]) holding that certain enterprises do not fall within the defined classes, are not determinative of the problem at hand. Respondent's further argument that airports are not within the defined classes, in our view, has nothing to do with the present issue. Whether or not City's airport is a public utility, it would not be subject to regulation by the California Public Utilities Commission.[18]

Additional authorities referred to by City dealing with facilities operated by the municipalities in question in their *governmental* capacities are also distinguishable. (City cites *inter alia: City of National City* v. *Fritz* (1949) 33 Cal.2d 635 [204 P.2d 7], construction of sewers; *Glass* v. *City of Fresno* (1936) 17 Cal.App.2d 555 [62 P.2d 765], garbage collection; *Larsen* v. *City & County of San Francisco* (1957) 152 Cal.App.2d 355 [313 P.2d 959], offstreet parking.) In each of the foregoing cases the basis of holding that the facility in question was not a public utility was the fact that

[18]It is to be noted that the Public Utilities Code contains provisions dealing with utilities owned by municipal corporations. Although not applicable to respondent here, such sections delineate a wide area for municipal activity in the public utility field. (See Pub. Util. Code §§ 10001-10213.)

in operating such facilities, the City was exercising *governmental functions,* whereas a city in the operation of its public utilities acts in a *proprietary* capacity. (*Larsen* v. *City & County of San Francisco, supra,* 152 Cal.App.2d 355, 367.)[19]

Respondent places particular reliance upon the opinion of this court in the *Larsen* case. In *Larsen* we were presented with the question whether a proposed offstreet parking facility to be constructed under the authority of the Parking Law of 1949 (Sts. & Hy. Code §§ 32500-34859) was a public utility so that leases thereof were subject to section 123 of the San Francisco Charter. The four reasons underlying our holding in *Larsen* that offstreet parking was not a public utility do not exist as determining factors in the present problem pertaining to the City's airport. First, in *Larsen,* we observed that neither the City's charter, nor any legislative act, nor the Constitution defined offstreet parking as a public utility. In the instant case, as we have pointed out, the charter declares that the airport is a public utility. Second, in *Larsen,* the Parking Law of 1949 provided that the functions undertaken thereunder were governmental. In the instant case, as stated above, the City, in operating a public airport, acts in a *proprietary* capacity. Third, in *Larsen,* the Parking Law of 1949 vested control of the facility in the Parking Authority and not in the City's municipal regulatory body. In the instant case, the airport is placed under the jurisdiction of the City's public utilities commission. (San Francisco Charter §§ 121, 125.) Regulatory power vested in the City pursuant to the Municipal and County Airport Law (Gov. Code § 50474) is in turn vested by the City's charter in its public utilities commission. (San Francisco Charter §§ 121, 125, 130.) Fourth, in *Larsen,* a municipal ordinance declared "that off-street parking facilities are not *public utilities* and not subject to the jurisdiction or control of the city's Public Utilities Commission." (*Larsen* v. *City & County of San Francisco, supra,* 152 Cal.App.2d at page 367, emphasis *not* added.) No similar excluding statement is present before us now. We do not believe therefore that our opinion in *Larsen*

---

[19]The following language from *Coleman* v. *City of Oakland* (1930) 110 Cal.App. 715, 720 [295 P. 59] is pertinent to the problem at hand: "We have no hesitancy in deciding that in the conduct of an air port the municipality is acting in a proprietary capacity. An air port falls naturally *into the same classification as such public utilities* as electric light, gas, water, and transportation systems, which are universally classed as proprietary." (Emphasis added.)

presents an analogy leading to a similar conclusion here that the airport is not a public utility.

City also argues that the Municipal and County Airport Law does not contain a declaration that airports are public utilities. We do not see how such a declaration is necessary, or its omission fatal, to the regulatory scheme here when it is borne in mind that the powers of regulation and control are vested by such act in the City and are in turn vested by the City's charter in its commission having jurisdiction over designated public utilities, including airports. Indeed we seriously question, although it is not necessary for us here to decide, whether the status of City's airport as a public utility would be destroyed or affected even by the absence of such declaration in its charter, providing that there were found present the necessary characteristics of a dedication of such facility to a public use. (*Allen* v. *Railroad Com.*, *supra*, 179 Cal. 68; *Munn* v. *Illinois* (1876) 94 U.S. 113 [24 L.Ed. 77].)

Finally, we feel that the court's conclusion that the airport is a public enterprise but not a public utility, when viewed conceptualistically, is inaccurate. California authorities holding that a municipal airport is a public enterprise (*Krenwinkle* v. *City of Los Angeles* (1935) 4 Cal.2d 611, 614 [51 P.2d 1098] ; *Pipes* v. *Hilderbrand* (1952) 110 Cal.App.2d 645, 647 [243 P.2d 123]) simply decide that in the acquisition and operation of an airport a municipality is acting properly within its powers and not using public funds for a private or commercial purpose. We do not think that the concepts of "public enterprise" and "public utility" are mutually exclusive. A public utility, properly within the ambit of municipal powers, is still a public enterprise. Conversely, the fact that a facility is a public enterprise does not of necessity prevent it from being a public utility.

Giving due and full respect to the caveat found in *Allen* v. *Railroad Com.*, *supra*, 179 Cal. 68 at page 85, that " '[t]o hold that property has been dedicated to a public use is "not a trivial thing" [citation], and such dedication is never presumed "without evidence of unequivocal intention" [citation],' " we are of the opinion that such intention is here manifest, that the San Francisco airport is a public utility, and its common use facilities a public utility service.

*There is no actionable discrimination.*

We turn to consider whether Western has any claim of actionable discrimination assertable on the basis of our fore-

going conclusions. Western claims that since it was charged substantially higher rates than those paid by United and TWA under their respective leases for the same common use facilities, there was unjust discrimination as a matter of law. No difference in rates, so it argues, is valid, unless based on a difference in service; no reasonable classification, justifying discrimination, can be based on the time of the commencement of airline operations at the airport; and no differential can find validity in special contracts available to some but not all users of the facilities.

We first dispose of some preliminary matters. To be successful at all, appellant's claims must find legal support under the common law, since we find, applicable to appellant, no statute proscribing the inequality of charges which is the nucleus of its complaint. Provisions of the State Aeronautics Commission Act (Pub. Util. Code, §§ 21001-21694) insofar as they require "equal, and uniform use" (Pub. Util. Code, § 21637) govern airports owned by the State of California and do not apply to City's airport here discussed. Nor does the statement in City's charter (San Francisco Charter, § 130) that "[r]ates may be fixed at varying scales for different classes of service or consumers" contain appellant's desideratum of equality. The section, in our view, is permissive in character. It does not demand that all users of facilities be charged equal rates, nor does it proscribe unequal rates, or even give definition to the terms employed.

Next, although Western claims that the rates charged it were unjustly *discriminatory*, it does not claim that they were *unreasonable*, in the sense that they were *excessive*. In fact, Western has conceded here, as well as in the court below, that the rates charged it were, in the above sense, *reasonable*. This is consistent with its formal pleadings. In its first affirmative defense, found in its amended and supplemental answer, Western alleges that the protested rates are "discriminatory and unjust." Nowhere does it allege that such rates were "unreasonable" or "excessive."

In this state there is *no cause of action at common law* for damages for discrimination in the absence of allegation and proof that the charges paid by the plaintiff were unreasonable and excessive. Inequality of charges, standing alone, is not per se actionable. (*Cowden* v. *Pacific Coast S.S. Co.* (1892) 94 Cal. 470 [29 P. 873, 28 Am.St.Rep. 142, 18 L.R.A. 221].) In *Cowden*, the complaint alleged that certain freight

charges constituted a discrimination against plaintiff, who paid at higher rates than another merchant. The court pointed out that at common law, the common carrier was not under an obligation to treat all customers equally, but only to charge no more than was reasonable, and held that, in the absence of a statute requiring equality, no cause of action was stated. "[T]he court concludes that the complaint is deficient in not stating that the charge to plaintiff was unreasonable; and that the allegation of discrimination or inequality is not the equivalent of an allegation of an excessive charge." ( P. 480.)

Appellant urges that the common law rule has been expanded by decisions in other jurisdictions so as to require *equality* as well as *reasonableness* of charge, citing *Western Union Tel. Co.* v. *Call Publishing Co.* (1901) 181 U.S. 92 [21 S.Ct. 561, 45 L.Ed. 765], on writ of error to Supreme Court of Nebraska; and 12 McQuillin, Municipal Corporations (3d ed. 1950), § 34.99, pp. 309-310. Whatever may be our disposition towards an eclectic consideration of the common law developments in other jurisdictions, we are of course bound by and must follow the rule announced by the Supreme Court in *Cowden.*

In addition, appellant argues that as interpreted by subsequent California decisions, it is now required in this state *under the common law* that public service charges be equal as well as reasonable and that the rule announced in *Cowden* no longer stands. In support of this position, appellant relies on *Nourse* v. *City of Los Angeles* (1914) 25 Cal.App. 384 [143 P. 801]; *Hobby* v. *City of Sonora* (1956) 142 Cal.App.2d 457 [298 P.2d 578]; and *Durant* v. *City of Beverly Hills* (1940) 39 Cal.App.2d 133 [102 P.2d 759]. Even if the decisions of the above District Courts of Appeal purported to abrogate or qualify the rule announced in *Cowden,* we would obviously still be bound to follow the Supreme Court opinion in that case. Nevertheless, as we shall show, the foregoing opinions do not change the *Cowden* rule.[20]

The *Nourse* case dealt with a municipal ordinance charging water rates to the property serviced and providing for shut off of supply in the event of delinquencies, irrespective of change of ownership or occupancy. It was held unreasonable

---

[20]*Cowden* v. *Pacific Coast S.S. Co.* is cited in *Lamb* v. *California Water & Tel. Co.* (1942) 21 Cal.2d 33, 43 [129 P.2d 371] and in *Southern Pac. Co.* v. *California Adjustment Co.* (9 Cir. 1916) 237 F. 954, 959 [150 C.C.A. 604].

and discriminatory as applied to the petitioner who sought to have water supplied after it had been shut off because of the delinquency of a former owner. It was not a rate discrimination case, although the court commented on the city's duty to furnish water to all inhabitants without discrimination.

The *Hobby* case involved an ordinance imposing an annual service charge on two-family dwellings *outside* city limits for sewer connections with the city's sewage system. The court held that the nonresident plaintiffs had no interest in the city's sewage system, were not part of the public served and that any rights they might have could be predicated only upon a contractual relationship with the city. No question of discrimination properly arose. The rule of *Cowden* was obviously not changed by the case.

In the *Durant* case, the plaintiff, living outside the city limits received water service from a privately owned utility, subsequently acquired by the defendant city, which thereupon charged different rates to consumers inside and to those outside the city limits. Judgment requiring the city to supply water to the plaintiff at the same rates as charged customers within city limits was reversed. From the opinion three possible bases for the reversal appear: (1) That the city by acquiring the private utility assumed a trust to perform its contracts and an obligation to furnish plaintiff water at *reasonable* rates, not necessarily at the same rates paid by residents of the city (It is therefore arguable that the case was disposed of on its particular facts and not on principles of public utility common law.) ; (2) that a utility may classify its customers on a reasonable basis and charge different rates thereby, the court judicially noticing many reasons which would justify a difference in rates to consumers differently situated; and (3) that in the absence of any showing that rates were unreasonable, unfair or fraudulently or arbitrarily established, the plaintiff had no grounds for relief. Both parties before us in the instant case, not surprisingly, have relied on *Durant.* Western argues that *Durant* was reversed because the plaintiff failed to prove substantially identical conditions prevailing between residents and nonresidents. City argues that the reversal is based on the failure to prove an unreasonable (i.e., excessive) rate. One thing is clear to us: *Durant* does not eliminate the requirement of alleging and proving an unreasonable rate in order to recover at common law.

Since the uncontradicted evidence shows and the appellant concedes that the rates charged Western were not excessive, Western has no actionable claim of discrimination and under the rule of law announced in *Cowden*, the judgment herein must be affirmed.

Assuming *arguendo* that Western is not precluded from recovery by the rule announced in *Cowden* and that, even though the charges paid by it were not excessive, a cause of action lies for discrimination based on a difference of rates, we proceed to consider whether there was unjust and therefore actionable discrimination under the facts in the record before us.

Whether in particular instances a difference of rates as between users of a public utility service constitutes unjust discrimination, or whether such difference is justified by the conditions and circumstances attending such use, are questions of fact depending on the matters proved in each case. (*Interstate Commerce Com.* v. *Alabama Midland Ry. Co.* (1897) 168 U.S. 144, 170 [18 S.Ct. 45, 42 L.Ed. 414]; *Barringer & Co.* v. *United States* (1943) 319 U.S. 1, 6 [63 S.Ct. 967, 87 L.Ed. 1171]; *Pennsylvania Co.* v. *United States* (1915) 236 U.S. 351, 361 [35 S.Ct. 370, 59 L.Ed. 616]; *Western Union Tel. Co.* v. *Call Publishing Co.*, *supra*, 181 U.S. 92, 103; *Postal Telegraph-Cable Co.* v. *Associated Press* (1920) 228 N.Y. 370 [127 N.E. 256, 258].) The trial court found that there was no unjust discrimination in the instant case. Our inquiry then is whether this finding is supported by substantial evidence.

Turning to consider the problem at hand, we cannot ignore its historical antecedents. At the heart of the controversy are the two long-term leases. Proper evaluation of the preferential charges which they embrace and the alleged discriminatory treatment which they generate can only be made in the light of the circumstances and conditions out of which they arose.

As we have pointed out, until Western entered the airport in 1944, United and TWA were the only scheduled air carriers operating from the airport. They had been operating there as the only scheduled airlines since 1932 and 1933 respectively but had not leased any land. It is obvious that in 1940, at the time of United's lease, the airport was still in its infancy. It is also clear that the following ten years were a period of growth and development. Statistics comparing

the fiscal year (1939-1940) preceding United's lease with the fiscal year (1950-1951) following the 1951 rate schedule are cogent and compelling: (a) Fixed capital in service increased from slightly less than $3,000,000 to almost $41,000,000; (b) airport passengers increased from approximately 126,000 to approximately 1,700,000; (c) scheduled air movements increased from less than 18,000 to almost 91,000. The record before us is replete with documentary evidence, including maps and photographs, which graphically demonstrate the physical expansion and development of the facilities.

United's first lease in 1940, as we detailed earlier, covered land and administration building space as well as the common use facilities. It was a part of a program in the moving of United's western district headquarters to the airport. It provided for the construction of capital improvements, to the cost of which, according to a later revision, City agreed to pay $400,000 and United agreed to pay $450,000, plus any excess cost. TWA's lease in 1942, also covered a hangar, shop space, and building space, as well as the common use facilities. In each instance, as we have mentioned, the leases were entered into pursuant to public bidding procedure of the charter. United's second lease in 1947 covered approximately five times as much land as the first lease and, while not eliminating the lease features of the common use facilities, for reasons we have indicated earlier, at least resulted in doubling the rates of the earlier lease and providing for subsequent adjustments at five-year intervals thereafter. There was evidence that United expended approximately $460,000 for improvements under the 1940 lease, and $11,400,000 between 1947 and 1957 under the 1947 lease.

The foregoing leases were thus integrated agreements for the leasing on a long-term basis of land and buildings as well as common use facilities and, in the case of United, for the construction of improvements which would eventually become the property of City. It is apparent that the parties contemplated the expenditure of large sums of money in capital and operating expenses, and the increase of air traffic by the only two scheduled airlines using the airport until Western entered in 1944. Rate provisions for common use facilities contained in the leases cannot be considered separately and apart from the lease agreement as a whole. It is clear that other considerations moved to City in addition to the amounts paid for such facilities. The leases were instruments skillfully

used by City to effect the expansion and development of its airport. To an airport still in infancy and facing the vicissitudes of growth, they offered on the part of its only two important patrons, a long-term guarantee of patronage and support and the commitment of participation in construction of new facilities. To insure for itself such advantages, City elected to proceed by contract rather than by the usual regulatory process in prescribing rates for common use facilities for these two airlines. Its authority to so proceed has been clearly established and each lease entered into by City was "a valid contract expressly authorized by state law." (*Trans World Airlines* v. *City & County of San Francisco, supra*, 228 F.2d 473, 476.)

Nevertheless City's regulatory process remained fully operative as to other users of such common facilities as is seen by the rate schedules adopted by its public utilities commission in 1941, 1946, 1951 and 1954. City thus created two classifications of users of its common use facilities at the airport: One group aiding in the growth and development of the airport, as we have pointed out, occupying and improving *exclusive* facilities and, as an adjunct thereof using *common* facilities; the other group, users of the common facilities only, uncommitted to the occupancy and development of airport land or other permanent facilities. The first group therefore used the common use facilities under *different circumstances and conditions* than the second group. There appears to us to be a logical and rational basis for such classification in the fact that the first group actively promoted the growth and development of the airport while the second group was under no such obligation. (Cf. *Live Oak Water Users' Assn.* v. *Railroad Com., infra,* (1923) 192 Cal. 132 [219 P. 65], writ of error dismissed (1926) 269 U.S. 354 [46 S.Ct. 149, 70 L.Ed. 305].)

The above classifications of airport users and the different methods employed by City to fix rates applicable to each, presented no problems until 1951 because until then the rates applicable to both classes (with the exception of TWA) were the same. It was only when the rates prescribed by each method—contract and regulation—became divergent upon the adoption of the 1951 schedule that we find the classifications challenged. These increased rates were necessary because of increased operating costs and demands for capital investment. There is no evidence in the record that such new rates were

not reasonable. Appellant concedes they were reasonable. City attempted by legal action to make such rates applicable to the leaseholders but was unsuccessful. (*Trans World Airlines* v. *City & County of San Francisco, supra,* 228 F.2d 473.) Since, as established by the above case, it had authority in fixing rates to proceed by contract or regulation, we can find no rule of law which compelled it to follow the former course. It is apparent that the City's airport had undergone phenomenal growth and development by 1951. Obviously, it was not necessary for City to resort to the same integrated agreements it found helpful under other conditions.

"It is only unjust or unreasonable discrimination which renders a rate or charge unreasonable; and a utility may, without being guilty of unlawful discrimination, *classify* its customers or patrons on *any reasonable basis,* as according to the purpose for which they receive its service or product, or the quantity or amount received, or the different character of the service furnished, and, subject to the general requirements of reasonableness . . . make separate rates for each class or group, even though there is but one customer included therein." (73 C.J.S., Public Utilities, § 27, pp. 1049-1050, emphasis added; see *Durant* v. *City of Beverly Hills, supra,* 39 Cal.App.2d 133, 139; *Live Oak Water Users' Assn.* v. *Railroad Com., infra* (1923) 192 Cal. 132 [219 P. 65], writ of error dismissed (1926) 269 U.S. 354 [46 S.Ct. 149, 70 L.Ed. 305].)

The trial court heard and examined voluminous evidence dealing with the history of the airport, its growth and development, the purposes and objectives of long-term leases, and the rate fixing policies of the City's public utilities commission. In our view, it could have properly concluded in the light of such evidence that the two classifications of users of the common facilities, which we have set out above, were reasonable and were based on material differences in the conditions and circumstances affecting each group. Stated another way, the court could have properly concluded that the common use facilities of the airport furnished to the above lessees under long-term obligations to sustain and develop the airport were not furnished under the same conditions and circumstances as they were to other users of the airport not under such obligations. Any apparent difference in rates is excused by dissimilar conditions and circumstances. (*Barringer & Co.* v. *United States, supra,* 319 U.S. 1; *Western*

*Union Tel. Co.* v. *Call Publishing Co., supra,* 181 U.S. 92; *Postal Telegraph-Cable Co.* v. *Associated Press, supra,* 228 N.Y. 370 [127 N.E. 256].) The court's finding therefore of no unjust discrimination is amply supported by substantial evidence.

Western appears to take the position, however, that *considered at any one time* the common use facilities offered by the City to all airlines are precisely the same and, therefore, both the service offered to United, TWA and Western and the conditions under which that service was rendered, were identical. The trial court was not required to dissect a continuum of time and circumstance into separate units or to isolate from their integrated agreements and thus from their proper setting, the clauses therein pertaining to common use facilities. The trial court was required to examine the problem as a whole and wholly. It would have been meaningless for the court to have confined its attention to the problem, arising for example in 1951, of having different rates fixed by different methods for two classifications of users, without examining the genesis and antecedents of each class to determine the rational basis of the classification. Only by so doing, could the court determine whether discrimination was justified or "unjust."

We find nothing in Western's efforts to secure what it refers to as a "lease" which affects or detracts from the trial court's finding on the discrimination issue. The court found that City refused to give Western a long-term lease of the common use facilities.[21] This does not support appellant's theory of discrimination because it is clear from the evidence that Western was not proposing to enter into an integrated type of lease similar to that of United, covering land as well as the common use facilities and providing for expenditures for capital improvements. Western admitted, through its witness Renda, that it was willing to lease hangar space but not land which it would develop. This is borne out by the fact that Western made no attempt to lease the specific lands acquired by United when they were put out to public bid. It is understandable when it is recalled that

---

[21]The court's finding states in relevant part: "excepting that with respect to the allegation contained in paragraph XIV, to wit, 'that at all times material to this case plaintiff has refused and still refuses to enter into a similar or any contract with defendant,' the Court finds that it is true that defendant demanded and attempted to negotiate a lease with the plaintiff for a fixed term of years for common-use facilities and that plaintiff declined and refused to enter into such a lease."

Western's maintenance base was at the Los Angeles Airport. It could be inferred that Western was not interested in becoming a catalyst in City's airport development. City's 1947 lease with United, on the other hand, can be justified on the basis that City, already bound under the 1940 lease and the lower rate schedule, was successful, through the 1947 lease, not only in leasing additional land and providing for United's construction of substantial improvements thereon but in cancelling the 1941 schedule of rates in favor of the 1946 schedule which doubled the rate.

Appellant contends that any classification between air carriers based on the time they commenced operations at the airport is invalid, relying upon *Postal Telegraph-Cable Co.* v. *Associated Press, supra,* 228 N.Y. 370 [127 N.E. 256]; and *Bradford* v. *Citizens' Telephone Co.* (1910) 161 Mich. 385 [126 N.W. 444]. Judge Cardozo stated in the *Postal Telegraph* case that "classes are not 'just and reasonable' when the *only* principle of classification is one of order in time, with a resulting division between old customers and new." (228 N.Y., p. 375, 127 N.E., p. 257; emphasis added.) We have no quarrel with such statement. Here, however, the principle of classification is the difference of conditions and circumstances. The *Bradford* case which condemned classifications of telephone subscribers made on the sole factor of whether they were old or new, is similarly distinguishable from the case before us.

Appellant's argument that special rate contracts do not justify a rate differential unless such contracts are available to all users is not only oversimplified and thus inaccurate but also sought to be applied contrary to the facts in this record. Special rate contracts can justify a differential in rates if customers holding contracts and those not holding contracts are so classified on a reasonable basis under the conditions and circumstances of the particular case. (73 C.J.S., Public Utilities, § 27, pp. 1049-1050, *supra; Durant* v. *City of Beverly Hills, supra,* 39 Cal.App.2d, 133.) Indeed *Live Oak Water Users' Assn.* v. *Railroad Com., supra,* 192 Cal. 132 upon which appellant relies, does not support appellant's proposition. On the contrary, it upholds a discrimination in rates charged by a public utility water company on the basis of a classification between old users who had contracts with the utility and new users who did not. The following language is pertinent to the case before us: "That there is a logical and natural ground for the classification made by the Railroad Commission seems

convincing. A great many of the contract consumers had, in various ways from the beginning of the utility's existence, *aided financially* and otherwise in the *construction* and *maintenance* of the irrigation system by liberal loans of money, advancements, donations of rights of way, and by making initial payments aggregating large amounts for water rights. . . .'' (192 Cal. 132 at p. 140; emphasis added.) Nor does appellant's citation of section 532 of the Public Utilities Code[22] support its above argument, since, as we have shown, such provisions of the code apply only to *privately* owned public utilities. (*Los Angeles Metropolitan Transit Authority* v. *Public Utilities Com., supra,* 52 Cal.2d 655, 661.)

Since we conclude that there is no actionable discrimination, we deem it unnecessary to consider City's contention that Western has failed to show any damage apart from the differential in rates.[23]

---

[22]Section 532 provides in relevant part that ''Except as in this article otherwise provided, no public utility shall . . . extend to any corporation or person any form of contract or agreement or any rule or regulation or any facility or privilege except such as are regularly and uniformly extended to all corporations and persons. The commission may by rule or order establish such exceptions from the operation of this prohibition as it may consider just and reasonable as to each public utility.''

[23]For this proposition, City relies on *Interstate Commerce Com.* v. *United States* (1933) 289 U.S. 385, 389-392 [53 S.Ct. 607, 77 L.Ed. 1273], where Mr. Justice Cardozo declared that when *discrimination* alone is the gist of the claim and a party who has paid only the *reasonable* rate sues upon a discrimination because some other party has paid less, ''the difference between one rate and another is not the measure of the damages. . . . He is to recover the damages that he has suffered, which may be more than the preference or less. . . . The question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less. . . . For all that appears the prices charged for lumber by producers within the group were the market prices current generally throughout the entire field of competition. [Footnote omitted.] If that is so, the producers in the favored territory were not making use of the preference to mark the price down to an equivalent extent, and thus deprive the complainant, less favorably situated, of a reasonable return. They were letting the price stand as it would have been if the tariff had been equal, and taking advantage of the preference to increase the profit for themselves. That was gain to them but it was not loss to the complainant. . . . There would be no necessary correspondence between preference and damage.''

We have not been referred to, nor have we found, any California case which passes on the question. In reply, Western's position is that the parties before us have by stipulation agreed that the recoverable sum is the amount of the protested rates. As noted in our opinion, we do not decide the above point.

*The 1951 schedule of rates was validly adopted.*

 Finally appellant contends that the 1951 schedule of rates was not validly adopted as a result of which the 1946 schedule remained in effect until the effective date of the 1954 schedule on September 1, 1954.[24]

Section 130 of City's charter provides that should the public utilities commission, in fixing rates for a utility, propose a so-called "deficit schedule," that is one which shall not produce revenue sufficient to pay operating expenses and other designated charges, for at least the *succeeding fiscal year*, it may do so *with the approval* of the board of supervisors by a *two-thirds vote*. The section also provides that an ordinary, that is nondeficit, schedule becomes effective unless a two-thirds majority of the board *rejects* it; upon failure of the board to act within 30 days in such latter case, the schedule becomes effective.[25]

As noted earlier, the 1951 schedule was approved by the board of supervisors by a seven-aye, three-no, and one absent vote. Since the board is composed of eleven members and under the charter (San Francisco Charter § 19) a two-thirds vote means two-thirds of all the members, such an approval would require eight-aye votes. The trial court concluded that the 1951 schedule "was legally and lawfully adopted by said [public utilities] commission" and "was legally and lawfully

[24]Appellant does not question the valid enactment of the 1954 schedule. Hence only the protested rates chargeable to the period January 1, 1951, through August 31, 1954, are here involved.

[25]Section 130 in relevant part provides: "Rates for each utility shall be so fixed that the revenue therefrom shall be sufficient to pay, for at least the *succeeding fiscal year*, all expenses of every kind and nature incident to the operation and maintenance of said utility, together with the interest and sinking fund for any bonds issued for the acquisition, construction or extension of said utility; provided that, should the commission propose a schedule of rates, charges or fares for said utility which shall *not produce such revenue*, it may do so with the approval of the board of supervisors, by a *two-thirds vote* and it shall thereupon be incumbent to provide by tax levy for the additional amount necessary to meet such deficit. All other changes in rates, charges or fares as *proposed by the commission* shall be submitted by the commission to the board of supervisors for approval, and, except as in this section otherwise provided, *it shall require a two-thirds vote* of the board of supervisors to *reject* the rate changes as proposed by the commission, and if so rejected, such proposed changes in schedules of rates, charges or fares shall be returned to the commission for revision. If the supervisors shall *fail to act* on any such proposed schedule within thirty days, the schedule shall thereupon *become effective*." (Emphasis added.)

approved'' by the board of supervisors.[26] The main question for our determination therefore is whether the schedule was a so-called ''deficit'' schedule or not.

The record discloses the following facts: On October 5, 1950, the manager of utilities submitted to the public utilities commission a proposed schedule of rates and charges together with a statement comparing the proposed rate and charge structure and revenue estimates with existing rates and charges. This comparison showed that, predicated on then existing traffic volume and occupancies, the net increase would be $140,475 per year. The report showed an estimate deficit of $87,437 under proposed rates as contrasted with an estimated deficit of $227,911 under existing rates. The above-mentioned letter of the manager of utilities is silent as to the fiscal year of which it is speaking but the statement of comparison of estimates of revenue and expenditures clearly refers to the fiscal year 1950-1951. Thus, such evidence showed that the proposed schedule of rates would produce a deficit in the *same* fiscal year, not in the *succeeding* fiscal year. No evidence showed that a deficit would be produced in the *succeeding* fiscal year, that is, the fiscal year July 1, 1951, to June 30, 1952.

On November 20, 1950, the public utilities commission adopted the above-mentioned proposed schedule. (S.F. Pub. Util. Com. Res. No. 11,182.) Approval by the board of supervisors followed on December 18, 1950. Neither the resolution of the commission nor the board refers to any dates. The record before us contains no other evidence as to the proceedings before the commission or the board. Since approval by the board of supervisors was not by two-thirds vote, it is implicit in the trial court's conclusion of legal and valid adoption and approval, that it found the 1951 schedule to be a *normal* schedule rather than a *deficit* schedule. It is clear that it could not be a deficit schedule because it did not show a deficit for the ''succeeding fiscal year.'' The case of *Hurst* v. *City & County of San Francisco* (1949) 33 Cal.2d 298, 302 [201 P.2d 805], in construing section 130 of the San Francisco Charter states: ''There can be no doubt that the reference to the 'succeeding fiscal year' in section 130 for

---

[26]The memorandum opinion of the trial judge indicates he felt that there was no evidence that the 1951 schedule would produce a deficit in the succeeding fiscal year, that is, July 1, 1951, to June 30, 1952.

which a fare shall be fixed at least equal to the operating expenses, means the next complete fiscal year after the date the schedule is fixed rather than the rest of the fiscal year in which the rate is established." (P. 302.)

Appellant argues that the forecasts made and submitted by the manager of utilities when coupled with the airport's history of deficit operations[27] make it clear that the public utilities commission adopted a deficit schedule within the ambit of section 130 of the charter. Appellant concedes that the estimates here in controversy referred to the fiscal year 1950-1951 (in other words, the same fiscal year) but argues that such annualized and adjusted figures predicated on traffic and conditions at the airport in October 1950, were actually the basis for estimating needs for the fiscal year 1951-1952. Thus, they were intended to show and did show an estimated deficit "for 'at least' the succeeding fiscal year."

There is no evidence in the record to support appellant's argument. The commission might not have intended at all to use the 1950-1951 estimates in the way urged by appellant. The estimates did not refer to the next succeeding fiscal year. It was appellant's burden to show that they did. Western introduced no evidence as to what was presented to the board of supervisors on December 18, 1950, at the time the 1951 schedule of rates was submitted for approval. Moreover the resolution of the public utilities commission directed that "said schedule of San Francisco Airport Rates and Charges be submitted to the Board of Supervisors for approval as required by Section 130 of the Charter and that, when approved, either expressly, or by *operation of law,* said Schedule of Rates and Charges go into effect commencing with the first day of January, 1951." (Emphasis added.) In our view this indicates that the commission did not consider that it was submitting a schedule which was a deficit schedule within the meaning of section 130. If it had been a deficit schedule, it could have been approved only by a two-thirds vote of the board of supervisors. Only a nondeficit schedule could have become effective "when, approved, either expressly or *by operation of law,*" that is, by the failure of the supervisors to act within 30 days.

---

[27]The airport showed a deficit in every year prior to the 1951 schedule. In all fiscal years 1938-1939 through 1949-1950 City made substantial contributions from general tax funds to defray deficits, totaling $10,654,955.88 for the 12 fiscal years.

The resolution of the board (Res. No. 10628, Series of 1939) approving such schedule is in the record before us, bearing the certification of the clerk of the board "that the foregoing resolution was adopted by the Board of Supervisors of the City and County of San Francisco at its meeting of Dec. 18, 1950." It is presumed that the board regularly performed its official duty and carried out all procedures necessary to the full and proper approval of the schedule submitted to it. (Code Civ. Proc., § 1963 subd. 15; *Bringle* v. *Board of Supervisors* (1960) 54 Cal.2d 86, 89 [4 Cal.Rptr. 493, 351 P.2d 765]; *Miller* v. *Planning Com.* (1956) 138 Cal.App.2d 598, 602-603 [292 P.2d 278].) Such a presumption is evidence. (*Smith* v. *Smith* (1958) 157 Cal.App.2d 658, 662 [321 P.2d 886].)

 Appellant argues, however, that a certain item of documentary evidence (*Plaintiff's* Exhibit 72) would prove conclusively that the 1951 schedule of rates was proposed as a deficit schedule and that the trial court erred in excluding it. The salient facts are ironic. The exhibit in question is an opinion of respondent's city attorney given in answer to a request by respondent's controller.[28] It bears date of December 29, 1950, 11 days after the board of supervisors approved the 1951 rate schedule. The exhibit was offered by *respondent, objected* to by *appellant,* and finally excluded by the trial court which *sustained appellant's objection* thereto.[29]

---

[28]The city attorney's opinion (Opinion No. 313) quotes the controller's request for an opinion. This quoted material in turn refers to a purported admission of the public utilities commission. The quoted material which appellant seeks to utilize as evidence is as follows: " 'The Public Utilities Commission, in making its presentation to the Board of Supervisors, admitted that the schedule of rates and charges for the San Francisco Airport, as proposed under its Resolution No. 11,182, would not be, to use the language of Charter Section 130, "sufficient to pay for at least the succeeding fiscal year, all expenses of every kind and nature incident to the operation and maintenance of said utility, together with the interest and sinking fund for any bonds issued for the acquisition, construction or extension of said utility xxxx." ' "

[29]On the last day of the trial respondent's counsel indicated City would offer the opinion as an administrative ruling showing that on the basis of a city attorney's opinion, the supervisors vote on the 1951 schedule was valid. Appellant's counsel questioned whether an opinion was evidence. The court observed that when filed, the offered exhibit, like others discussed, would be marked for identification subject to the objection of appellant's counsel. This was pursuant to a prior ruling of the court under which various exhibits were to be so marked and their admissibility in evidence subsequently argued by counsel for the parties. The exhibit was finally filed with the court during the oral argument, which occurred

Appellant argues that if the exhibit was objectionable at all, it was on the ground of hearsay and, since no *special* objection was made by appellant on that ground, appellant's general objection, if it made one, was insufficient to raise the hearsay objection, relying upon *Rupp* v. *Summerfield* (1958) 161 Cal.App.2d 657, 662 [326 P.2d 912]. As a result appellant takes the position that it is not here precluded by any objection in the record, from challenging the trial court's exclusion of the exhibit.

It is clear to us that appellant's counsel made an objection to the exhibit. Since the objection did not specifically state the grounds or specify the particular defect, it was a general objection. The rule is settled that a general objection will not raise on appeal the point of erroneous *admission* of evidence on the specific ground that it was hearsay. Such an objection constitutes waiver of the defect. (Witkin, California Evidence, §§ 700-703, pp. 732-736; *Rupp* v. *Summerfield, supra,* 161 Cal.App.2d 657.) The above rule does not apply to the *exclusion* of evidence. When evidence is *excluded* upon a mere general objection, the trial court's ruling will be upheld if any ground exists for the exclusion (1 Wigmore, Evidence (3d ed. 1940) § 18, pp. 332-338; McBaine, California Evidence Manual, § 1494, p. 537). The document in question is clearly hearsay. Paraphrasing Wigmore, this "valid ground was apparent to the judge without express statement." (Wigmore, *supra,* p. 338.) The trial court did not err in rejecting the exhibit in question. We are of the opinion therefore that the conclusion of the trial court that the 1951 schedule of rates was legally and lawfully adopted by the public utilities commission and was legally and lawfully approved by the board of supervisors is supported by the record and must be upheld. We therefore deem it unnecessary to consider other contentions made by City in support of its position on this issue.

We therefore hold that Western has no actionable claim of unjust discrimination for the recovery of charges paid by it under protest, based upon the Federal Airport Act of 1946 or upon any of the assurances or agreements made by City to the federal government pursuant to such act or other

some six months after the trial. At that time, upon the court's inquiry of counsel as to whether there was an objection to the document, one of appellant's counsel stated that there had been an objection previously by another counsel of appellant.

federal acts; that Western has no such actionable claim under principles of public utility law assertable upon the basis, as we so conclude, that City's airport is a public utility and the common use facilities thereof are a public utility service; that the 1951 schedule of rates for the airport was validly adopted and approved; and that all charges made for such facilities against Western during the period here involved were legally and properly made, received and retained by City.

The judgment is affirmed.

Bray, P. J., and Tobriner, J., concurred.

A petition for a rehearing was denied June 18, 1962, and appellant's petition for a hearing by the Supreme Court was denied July 25, 1962. Tobriner, J., did not participate therein. Dooling, J.,* participated in place of Traynor, J.

_____
*Assigned by Chairman of Judicial Council.