[Civ. No. 10551.   Third Dist.   Nov. 29, 1963.]

GOURMET LANE, INC., Plaintiff and Respondent, v. CLYDE KELLER, Defendant and Appellant.

Broyer & Shattuck and William H. Abbott for Defendant and Appellant.

Lally, Martin & Luce and Thomas W. Martin for Plaintiff and Respondent.

PIERCE, P. J.—Plaintiff, after a court trial, recovered a money judgment in an action based upon a contractual obligation by defendant to pay his agreed share of certain expenses in a joint food purveying operation.

Defendant's appeal is on the ground that neither of the two theories of plaintiff's complaint was established. These theories were: (1) a direct agreement between plaintiff, an incorporated association, and defendant, one of its members, whereby the latter agreed to pay at the rate charged by plaintiff's board of directors for services admittedly received; and (2) defendant's obligation under a third party beneficiary contract to pay at such rate. The findings and holding of the trial court are in favor of plaintiff on both counts. We agree.

Plaintiff has seven shareholder-members, all of whom are directors. The seven are operators of food-dispensing concessions under separate leases with Kassis Building Corporation in the concourse of a large Sacramento market owned by the lessor. This concourse is known as Gourmet Lane.

The lessor furnished a dining area, kitchen, dishwashing and garbage disposal facilities used in common by these seven tenants.

Each lease contains the following provisions: "Lessee promises and agrees, together with such other tenants as there may be of the other concourse shops, to maintain and operate in a sanitary businesslike manner the said dining

area at no cost or expense of any nature to lessor. Lessee shall enter into an association and cooperate with such other tenants in the operation of said dining area. This obligation is to be joint and several among all of said tenants. *A decision of the majority of said tenants with regard to the details of the operation and maintenance of said area and allocating the costs thereof shall be binding upon lessee and all of the other tenants."* (Italics supplied.)

The tenants first operated as a voluntary unincorporated association, but soon decided to incorporate and plaintiff corporation was organized. The bylaws, approved by defendant, provide that a majority of directors shall constitute a quorum. They also provide: "Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present shall be regarded as the act of the board of directors, ..."

At an early meeting the directors discussed the method to be adopted to defray the community expenses. One member preferred a "dish count" as a basis of allocation. This would have afforded a fair distribution of dishwashing costs which were apparently a major item of expense. Defendant operated a doughnut shop, including the dispensing of coffee and doughnuts to be eaten on the premises. He would have had a higher dish count per dollar volume than some of the others. He, with others, objected to this method of cost apportionment, since dishwashing was but one of the joint operating expenses. Apportionment on the ratio which the taxable sales of each bore to the taxable sales of all with a minimum charge to be fixed was the method finally agreed to by all the members. At the first meeting after the opening of the market $100 per week was agreed to by resolution of the directors as the fixed minimum. Defendant voted for this resolution. This was on December 6, 1958. By February 1959 all members but defendant had shown, and were paying charges based upon, sales tax returns in excess of the minimum. Defendant objected to the $100 minimum and, upon his request, the directors voted to reduce the weekly minimum to $75. At the February 16, 1959, meeting Keller again requested that the minimum be dropped; this time to $50 per week. The directors refused this request. Defendant testified he "went along with" that position. Defendant continued to take an active part in the affairs of the corporation. He was its treasurer and handled all of its finances. For a short time, he actively managed the maintenance operations.

Defendant throughout this period continued to pay the $75 per week minimum. Commencing June 1, 1960, he refused to make further payments. The directors had refused his requests to abolish or lower the minimum charge. Although defendant contends the charge is unfair and discriminates against his operation, plaintiff argues otherwise. It points out that when he pays the weekly minimum defendant's share is but 6.54 per cent of the total expenses, the percentages of the others running from 11.99 per cent to 23.75 per cent. Defendant's total gross receipts on the other hand are in line with the others and even exceed those of one other member. It was also shown that defendant's expenses are less than he would have had to pay operating alone.

When defendant discontinued paying the $75 per week he discontinued all payments,[1] although continuing to enjoy the community services furnished. He has continued so to use the facilities and is still a member of the association.

It seems clear from the testimony of all the witnesses that no perfect method of apportioning the joint expenses of an enterprise of this type could be evolved. An accountant employed by the corporation to study the matter and investigate the method of allocation adopted by food purveyors in similar markets in other localities reported they used the same basis. In any event it was the method to which a majority of the group had agreed and defendant had agreed with his associates to be bound by the decision of a majority. The trial court, moreover, has found that the ''basis established by the Board of Directors for allocating the costs of operating the community kitchen and dining room facilities among each of the purveyors of food is fair, equitable, and just and binding upon defendant .... '' Evidence supports these findings and we cannot disturb them.

Determination of the appeal could rest upon this alone. However, it is not the sole reason for affirming the judgment of the trial court.

■ The second theory of the complaint was that a third party beneficiary contract existed under which plaintiff was the beneficiary giving it a legal right to sue thereunder. The trial court accepted this theory and its holding is sound.

The lease provision which we have quoted above (1) creates a joint and several liability in, and between, the several

---

[1]During pendency of the action he made back payments based upon his theory of the amount due; i.e., in the ratio his taxable receipts bore to the total.

tenants of the concourse to defray the maintenance costs of the dining and kitchen areas; to insure the collection of these costs in an expeditious and orderly manner the tenants (2) are required to organize themselves into an association to administer the joint operation and (3) to adopt "majority rule" in fixing maintenance cost allocation.

Under these contracts the tenants (promisors) agree with the lessor (promisee) to pay money for maintenance costs to plaintiff-association (third party beneficiary). Since the plaintiff was not a party to the agreement, in fact was not then even in existence, it may be true—if courts must be obeisant to the privity rule—that we must bring ourselves within an exception to it. One exception is in Civil Code section 1559. It provides:

"A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

Courts have found difficulty sometimes determining when a contract is made "expressly" for the benefit of a third party. (See discussion in *Lucas* v. *Hamm*, 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685].) However, as is stated by Chief Justice Gibson in the case last cited (at p. 590): "... The effect of the section is to exclude enforcement by persons who are only incidentally or remotely benefited." Here plaintiff is more than incidentally or remotely benefited.

The whole *raison d'etre* for plaintiff was the creation of an entity (whether incorporated or not) which could efficiently maintain the dining and kitchen area. This the tenants, of whom defendant was one, promised to accomplish. Having also promised to bear the maintenance costs jointly and severally, they agreed to a "majority rule" allocation of these costs and obviously, since an association was to be organized, it was the parties' intent that the expression of majority rule would be through governance of that entity. Granted this is not the usual form of third party beneficiary contract, since the plaintiff was not a creditor-beneficiary (i.e., it was not a creditor of the promisee) and was not donee-beneficiary in the sense that a gift was intended to be made to plaintiff. It was, however, donee-beneficiary as defined by the Restatement, the purpose of the promisee in obtaining the promise being "to confer upon [the beneficiary] a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary." (Rest., Contracts, § 133(1) (a).) In *El Rio Oils* v. *Pacific*

*Coast Asphalt Co.*, 95 Cal.App.2d 186, 192 [213 P.2d 1], it was held that a preincorporation agreement made by one of the incorporators (as promisor) with another (as promisee) for the benefit of the corporation to be formed could be enforced and sued on by the latter as a third party beneficiary. Plaintiff was therefore entitled to sue on the contract as a third party beneficiary.

The judgment is affirmed.

Schottky, J., and Friedman, J., concurred.