[L.A. No. 29985. In Bank. May 1, 1974.]

IGNACIO MARTINEZ et al., Plaintiffs and Appellants, v.
SOCOMA COMPANIES, INC., et al., Defendants and Respondents.

**COUNSEL**

Richard N. Fisher, Frank G. Ker and Brent N. Rushforth for Plaintiffs and Appellants.

Buchalter, Nemer, Fields & Savitch, Earl P. Willens, Richard D. Bronner, Caditz & Grant and M. Alfred Karlsen for Defendants and Respondents.

**OPINION**

**WRIGHT, C. J.**—Plaintiffs brought this class action on behalf of themselves and other disadvantaged unemployed persons, alleging that defendants failed to perform contracts with the United States government under which defendants agreed to provide job training and at least one year of employment to certain numbers of such persons. Plaintiffs claim that they and the other such persons are third party beneficiaries of the contracts and as such are entitled to damages for defendants' nonperformance. General demurrers to the complaint were sustained without leave to amend, apparently on the ground that plaintiffs lacked standing to sue as third party beneficiaries. Dismissals were entered as to the demurring defendants, and plaintiffs appeal.

We affirm the judgments of dismissal. ▉ As will appear, the contracts nowhere state that either the government or defendants are to be liable to persons such as plaintiffs for damages resulting from the defendants' nonperformance. The benefits to be derived from defendants' performance were clearly intended not as gifts from the government to such persons but as a means of executing the public purposes stated in the contracts and

in the underlying legislation. Accordingly, plaintiffs were only incidental beneficiaries and as such have no right of recovery.

The complaint names as defendants Socoma Companies, Inc. ("Socoma"), Lady Fair Kitchens, Incorporated ("Lady Fair"), Monarch Electronics International, Inc. ("Monarch"), and eleven individuals of whom three are alleged officers or directors of Socoma, four of Lady Fair, and four of Monarch. Lady Fair and the individual defendants associated with it, a Utah corporation and Utah residents respectively, did not appear in the trial court and are not parties to this appeal.

The complaint alleges that under 1967 amendments to the Economic Opportunity Act of 1964 (81 Stat. 688-690, 42 U.S.C. §§ 2763-2768, repealed by 86 Stat. 703 (1972)) "the United States Congress instituted Special Impact Programs with the intent to benefit the residents of certain neighborhoods having especially large concentrations of low income persons and suffering from dependency, chronic unemployment and rising tensions." Funds to administer these programs were appropriated to the United States Department of Labor. The department subsequently designated the East Los Angeles neighborhood as a "Special Impact area" and made federal funds available for contracts with local private industry for the benefit of the "hard-core unemployed residents" of East Los Angeles.

On January 17, 1969, the corporate defendants allegedly entered into contracts with the Secretary of Labor, acting on behalf of the Manpower Administration, United States Department of Labor (hereinafter referred to as the "Government"). Each such defendant entered into a separate contract and all three contracts are made a part of the complaint as exhibits. Under each contract the contracting defendant agreed to lease space in the then vacant Lincoln Heights jail building owned by the City of Los Angeles, to invest at least $5,000,000 in renovating the leasehold and establishing a facility for the manufacture of certain articles, to train and employ in such facility for at least 12 months, at minimum wage rates, a specified number of East Los Angeles residents certified as disadvantaged by the Government, and to provide such employees with opportunities for promotion into available supervisorial-managerial positions and with options to purchase stock in their employer corporation. Each contract provided for the lease of different space in the building and for the manufacture of a different kind of product. As consideration, the Government agreed to pay each defendant a stated amount in installments. Socoma was to hire 650 persons and receive $950,000; Lady Fair was to hire 550 persons and receive $999,000; and Monarch was to hire 400 persons and receive $800,000. The hiring of these persons was to be completed by January 17, 1970.

Plaintiffs were allegedly members of a class of no more than 2,017 East Los Angeles residents who were certified as disadvantaged and were qualified for employment under the contracts. Although the Government paid $712,500 of the contractual consideration to Socoma, $299,700 to Lady Fair, and $240,000 to Monarch, all of these defendants failed to perform under their respective contracts, except that Socoma provided 186 jobs of which 139 were wrongfully terminated, and Lady Fair provided 90 jobs, of which all were wrongfully terminated.

The complaint contains 11 causes of action. The second, fourth, and sixth causes of action seek damages of $3,607,500 against Socoma, $3,052,500 against Lady Fair, and $2,220,000 against Monarch, calculated on the basis of 12 months' wages at minimum rates and $1,000 for loss of training for each of the jobs the defendant contracted to provide. The third and fifth causes of action seek similar damages for the 139 persons whose jobs were terminated by Socoma and the 90 persons whose jobs were terminated by Lady Fair. The first, seventh, and eighth causes of action seek to impose joint liability on Socoma, Lady Fair, and Monarch as joint venturers, alleging that they negotiated the contracts through a common representative and entered into a joint lease of the Lincoln Heights jail building. The ninth, tenth, and eleventh causes of action seek to impose the liability of the corporate defendants upon their officers and directors named as individual defendants, alleging that the latter undercapitalized their respective corporations and used the same as their *alter egos*.[1]

Each cause of action alleges that the "express purpose of the [Government] in entering into [each] contract was to benefit [the] certified disadvantaged hard-core unemployed residents of East Los Angeles [for whom defendants promised to provide training and jobs] and none other, and those residents are thus the express third party beneficiaries of [each] contract."

■ The general demurrers admitted the truth of all the material factual allegations of the complaint, regardless of any possible difficulty in proving them (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216]), but did not admit allegations which constitute conclusions of law (*Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 329 [253 P.2d 659]) or which are contrary to matters of which we must take judicial notice (*Chavez* v. *Times-Mirror Co.* (1921) 185 Cal. 20, 23 [195 P. 666]). (See Witkin, Cal. Procedure (2d ed. 1971)

---

[1]The fourth, fifth, and tenth causes of action, being directed solely against non-appearing defendants, to wit, Lady Fair and its officers and directors, are not before us on this appeal.

Pleading, §§ 328, 800.) When a complaint is based on a written contract which it sets out in full, a general demurrer to the complaint admits not only the contents of the instrument but also any pleaded meaning to which the instrument is reasonably susceptible. (*Coast Bank* v. *Minderhout* (1964) 61 Cal.2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265].) Moreover, where, as here, the general demurrer is to an *original* complaint and is sustained without leave to amend, "the issues presented are whether the complaint states a cause of action, and, if not, whether there is a reasonable possibility that it could be amended to do so." (*MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 542 [343 P.2d 36]; see 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 845.) Thus, we must determine whether the pleaded written contracts support plaintiffs' claim either on their face or under any interpretation to which the contracts are reasonably susceptible and which is pleaded in the complaint or could be pleaded by proper amendment. This determination must be made in light of applicable federal statutes and other matters we must judicially notice. (Evid. Code, §§ 451, 459, subd. (a).)

Plaintiffs contend they are third party beneficiaries under Civil Code section 1559, which provides: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." This section excludes enforcement of a contract by persons who are only incidentally or remotely benefited by it. (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 590 [15 Cal.Rptr. 821, 364 P.2d 685].) American law generally classifies persons having enforceable rights under contracts to which they are not parties as either creditor beneficiaries or donee beneficiaries. (Rest., Contracts, §§ 133, subds. (1), (2), 135, 136, 147; 2 Williston on Contracts (3d ed. 1959) § 356; 4 Corbin on Contracts (1951) § 774; see Rest.2d Contracts (Tentative Drafts 1973) § 133, coms. b, c.) California decisions follow this classification. (*Southern Cal. Gas Co.* v. *ABC Construction Co.* (1962) 204 Cal.App.2d 747, 752 [22 Cal.Rptr. 540]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 500.)

A person cannot be a creditor beneficiary unless the promisor's performance of the contract will discharge some form of legal duty owed to the beneficiary by the promisee. (*Hartman Ranch Co.* v. *Associated Oil Co.* (1937) 10 Cal.2d 232, 244 [73 P.2d 1163]; Rest., Contracts, § 133, subd. (1)(b).) Clearly the Government (the promisee) at no time bore any legal duty toward plaintiffs to provide the benefits set forth in the contracts and plaintiffs do not claim to be creditor beneficiaries.

A person is a donee beneficiary only if the promisee's contractual intent *is* either to make a gift to him or to confer on him a right against

the promisor. (Rest., Contracts, § 133, subd. (1)(a).) If the promisee intends to make a gift, the donee beneficiary can recover if such donative intent must have been understood by the promisor from the nature of the contract and the circumstances accompanying its execution. (*Lucas* v. *Hamm, supra,* 56 Cal.2d at pp. 590-591.) This rule does not aid plaintiffs, however, because, as will be seen, no intention to make a gift can be imputed to the Government as promisee.

Unquestionably plaintiffs were among those whom the Government intended to benefit through defendants' performance of the contracts which recite that they are executed pursuant to a statute and a presidential directive calling for programs to furnish disadvantaged persons with training and employment opportunities. However, the fact that a Government program for social betterment confers benefits upon individuals who are not required to render contractual consideration in return does not necessarily imply that the benefits are intended as gifts. ■ Congress' power to spend money in aid of the general welfare (U.S. Const., art. I, § 8) authorizes federal programs to alleviate national unemployment. (*Helvering* v. *Davis* (1937) 301 U.S. 619, 640-645 [81 L.Ed. 1307, 1314-1317, 57 S.Ct. 904, 109 A.L.R. 1319].) The benefits of such programs are provided not simply as gifts to the recipients but as a means of accomplishing a larger public purpose. The furtherance of the public purpose is in the nature of consideration to the Government, displacing any governmental intent to furnish the benefits as gifts. (See *County of Alameda* v. *Janssen* (1940) 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141]; *Allied Architects' Assn.* v. *Payne* (1923) 192 Cal. 431, 438-439 [221 P. 209, 30 A.L.R. 1029].)

■ Even though a person is not the intended recipient of a gift, he may nevertheless be "a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise . . . is . . . to *confer upon him a right against the promisor* to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary." (Rest., Contracts, § 133, subd. (1)(a) (italics supplied); *Gourmet Lane, Inc.* v. *Keller* (1963) 222 Cal.App.2d 701, 705 [35 Cal.Rptr. 398].) ■ The Government may, of course, deliberately implement a public purpose by including provisions in its contracts which expressly confer on a specified class of third persons a direct right to benefits, or damages in lieu of benefits, against the private contractor. But a governmental intent to confer such a direct right cannot be inferred simply from the fact that the third persons were intended to enjoy the benefits. The Restatement of Contracts makes this clear in dealing specifically with contractual promises to the Government to render services to members of the public: "A promisor

bound to the United States or to a State or municipality by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless, . . . *an intention is manifested in the contract,* as interpreted in the light of the circumstances surrounding its formation, *that the promisor shall compensate members of the public for such injurious consequences . . . ."* (Rest., Contracts, § 145 (italics supplied);[2] see *City & County of San Francisco* v. *Western Air Lines, Inc.* (1962) 204 Cal.App.2d 105, 121 [22 Cal.Rptr. 216].)

■ The present contracts manifest no intent that the defendants pay damages to compensate plaintiffs or other members of the public for their nonperformance. To the contrary, the contracts' provisions for retaining the Government's control over determination of contractual disputes and for limiting defendants' financial risks indicate a governmental purpose to exclude the direct rights against defendants claimed here.

Each contract provides that any dispute of fact arising thereunder is to be determined by written decision of the Government's contracting officer, subject to an appeal to the Secretary of Labor, whose decision shall be final unless determined by a competent court to have been fraudulent, capricious, arbitrary, in bad faith, or not supported by substantial evidence. These administrative decisions may include determinations of related questions of law although such determinations are not made final. The efficiency and uniformity of interpretation fostered by these administrative procedures would tend to be undermined if litigation such as the present action, to which the Government is a stranger, were permitted to proceed on the merits.

In addition to the provisions on resolving disputes each contract contains a "liquidated damages" provision obligating the contractor to refund all amounts received from the Government, with interest, in the event of failure to acquire and equip the specified manufacturing facility, and, for each employment opportunity it fails to provide, to refund a stated dollar amount equivalent to the total contract compensation divided by the num-

---

[2]The corresponding language in the Tentative Drafts of the Restatement Second of Contracts (1973), section 145, is: "[A] promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless . . . the terms of the promise provide for such liability . . . ."

The language omitted in this quotation and the quotation in the accompanying text relates to the creditor beneficiary situation in which the government itself would be liable for nonperformance of the contract. As noted earlier, plaintiffs do not claim to be creditor beneficiaries.

ber of jobs agreed to be provided. This liquidated damages provision limits liability for the breaches alleged by plaintiffs to the refunding of amounts received and indicates an absence of any contractual intent to impose liability directly in favor of plaintiffs, or, as claimed in the complaint, to impose liability for the value of the promised performance. To allow plaintiffs' claim would nullify the limited liability for which defendants bargained and which the Government may well have held out as an inducement in negotiating the contracts.[3]

It is this absence of any manifestation of intent that defendants should pay compensation for breach to persons in the position of plaintiffs that distinguishes this case from *Shell* v. *Schmidt* (1954) 126 Cal.App.2d 279 [272 P.2d 82], relied on by plaintiffs. The defendant in *Shell* was a building contractor who had entered into an agreement with the federal government under which he received priorities for building materials and agreed in return to use the materials to build homes with required specifications for sale to war veterans at or below ceiling prices. Plaintiffs were 12 veterans, each of whom had purchased a home that failed to comply with the agreed specifications. They were held entitled to recover directly from the defendant contractor as third party beneficiaries of his agreement with the government. The legislation under which the agreement was made included a provision empowering the government to obtain payment of monetary compensation by the contractor to the veteran purchasers for deficiencies resulting from failure to comply with specifications. Thus, there was "an intention . . . manifested in the contract . . . that the promisor shall compensate members of the public for such injurious consequences [of nonperformance]."[4]

---

[3]Comment *a* of section 145 of the Tentative Drafts of the Restatement Second of Contracts points out that these factors—retention of administrative control and limitation of contractor's liability—make third party suits against the contractor inappropriate: "Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested. In case of doubt, a promise to do an act for or render a service to the public does not have the effect of a promise to pay consequential damages to individual members of the public unless the conditions of Subsection (2)(b) [including governmental liability to the claimant] are met. Among factors which may make inappropriate a direct action against the promisor are *arrangements for governmental control over the litigation and settlement of claims, the likelihood of impairment of service or of excessive financial burden,* and the availability of alternatives such as insurance." (Italics supplied.)

[4]In contrast to *Shell, supra,* is *City & County of San Francisco* v. *Western Air Lines, Inc., supra,* 204 Cal.App.2d 105. There, Western Air Lines claimed to be a third party beneficiary of agreements between the federal government and the City and County of San Francisco under which the city received federal funds for the development of its airport subject to a written condition that the airport "be available for public use on fair and reasonable terms and without unjust discrimination."

Plaintiffs contend that section 145 of the Restatement of Contracts, previously quoted, does not preclude their recovery because it applies only to promises made to a governmental entity "to do an act or render a service to . . . the public," and, plaintiffs assert they and the class they represent are identified persons set apart from "the public." Even if this contention were correct it would not follow that plaintiffs have standing as third party beneficiaries under the Restatement. The quoted provision of section 145 "is a special application of the principles stated in §§ 133 (1a), 135 [on donee beneficiaries]" (Rest., Contracts, § 145, com. a), delineating certain circumstances which preclude government contractors' liability to third parties. Section 145 itself does not purport to confer standing to sue on persons who do not otherwise qualify under basic third party beneficiary principles.[5] As pointed out above, plaintiffs are not donee beneficiaries under those basic principles because it does not appear from the terms and circumstances of the contract that the Government intended to make a gift to plaintiffs or to confer on them a legal right against the defendants.

Moreover, contrary to plaintiffs' contention, section 145 of the Restatement of Contracts does preclude their recovery because the services which the contracts required the defendants to perform *were* to be rendered to "members of the public" within the meaning of that section. Each contract recites it is made under the "Special Impact Programs" part of the Economic Opportunity Act of 1964 and pursuant to a presidential directive.

---

Western Air Lines asserted that it had been charged for its use of the airport at a higher rate than some other air carriers in violation of the contractual condition, and therefore was entitled to recover the excess charges from the city. One of the reasons given by the court on appeal for rejecting this contention was the absence of any provision or indication of intent in the agreements between the government and the city to compensate third parties for noncompliance. The court said: "The granting agreement in each instance entitles the [federal] administrator to recover all grant payments made where there has been any misrepresentation or omission of a material fact by the sponsor [i.e., the city]. We find no other provision for recovery of funds by the administrator and none whatsoever permitting recovery of money or excess rates by a private party. Indeed the language of the granting agreement itself appears to us to point up that it is simply and entirely a financial arrangement between two parties. As the agreement states, it constitutes 'the obligations and rights of the United States and the Sponsor with respect to the accomplishment of the Project. . . .' " (204 Cal.App.2d at p. 120.)

[5]The same is true of the Tentative Draft of section 145 of the Restatement Second of Contracts which declares that the general rules on third party beneficiaries "apply to contracts with a government or governmental agency except to the extent that application would contravene the policy of the law authorizing the contract or prescribing remedies for its breach" and that "[i]n particular" the limitations of section 145, including those set forth in footnote 2, *supra,* apply to a government contractor's liability to a member of the public for nonperformance of a service to the public.

for a test program of cooperation between the federal government and private industry in an effort to provide training and jobs for thousands of the hard-core unemployed or under-employed.[6] The congressional declaration of purpose of the Economic Opportunity Act as a whole points up the public nature of its benefits on a national scale. Congress declared that the purpose of the act was to "strengthen, supplement, and coordinate efforts in furtherance of [the] policy" of "opening to everyone the opportunity for education and training, the opportunity to work, and the opportunity to live in decency and dignity" so that the "United States can achieve its full economic and social potential as a nation." (42 U.S.C. § 2701.)[7]

In providing for special impact programs, Congress declared that such programs were directed to the solution of critical problems existing in particular neighborhoods having especially large concentrations of low-income persons, and that the programs were intended to be of sufficient size and scope to have an appreciable impact in such neighborhoods in arrest-

---

[6]The contracts recite:

"WHEREAS, the Secretary of Labor is authorized by delegation from the Director of the Office of Economic Opportunity, dated June 17, 1968, approved by the President of the United States on June 27, 1968 (33 F.R. 9850, July 9, 1968), to enter into contracts to provide for Special Impact Programs, pursuant to Title ID of the Economic Opportunity Act of 1964, as amended, hereinafter referred to as the Act, directed to the solution of the critical problems existing in particular communities and neighborhoods within urban areas of the Nation having especially large concentrations of low-income persons and

"WHEREAS, the President of the United States on October 2, 1967, launched a major test program to mobilize the resources of private industry and the Federal Government to help find jobs and provide training for thousands of the Nation's hard-core unemployed, or under-employed, by inviting private industry throughout the country to join with the agencies and departments of the Federal Government in assuming responsibility for providing training and work opportunities for such seriously disadvantaged persons.

"Now THEREFORE, pursuant to the aforesaid statutory authority, and the directive of the President, the parties hereto, in consideration of the mutual promises herein expressed, agree as follows: . . ."

[7]Section 2701 declares: "Although the economic well-being and prosperity of the United States have progressed to a level surpassing any achieved in world history, and although these benefits are widely shared throughout the Nation, poverty continues to be the lot of a substantial number of our people. The United States can achieve its full economic and social potential as a nation only if every individual has the opportunity to contribute to the full extent of his capabilities and to participate in the workings of our society. It is, therefore, the policy of the United States to eliminate the paradox of poverty in the midst of plenty in this Nation by opening to everyone the opportunity for education and training, the opportunity to work, and the opportunity to live in decency and dignity. It is the purpose of this chapter to strengthen, supplement, and coordinate efforts in furtherance of that policy.

"It is the sense of the Congress that it is highly desirable to employ the resources of the private sector of the economy of the United States in all such efforts to further the policy of this chapter."

ing tendencies toward dependency, chronic unemployment and rising community tensions. (42 U.S.C. former § 2763.)[8] Thus the contracts here were designed not to benefit individuals as such but to utilize the training and employment of disadvantaged persons as a means of improving the East Los Angeles neighborhood. Moreover, the means by which the contracts were intended to accomplish this community improvement were not confined to provision of the particular benefits on which plaintiffs base their claim to damages—one year's employment at minimum wages plus $1,000 worth of training to be provided to each of 650 persons by one defendant, 400 by another, and 550 by another. Rather the objective was to be achieved by establishing permanent industries in which local residents would be permanently employed and would have opportunities to become supervisors, managers and part owners. The required minimum capital investment of $5,000,000 by each defendant and the defendants' 22-year lease of the former Lincoln Heights jail building for conversion into an industrial facility also indicates the broad, long-range objective of the program. Presumably, as the planned enterprises prospered, the quantity and quality of employment and economic opportunity that they provided would increase and would benefit not only employees but also their families, other local enterprises and the government itself through reduction of law enforcement and welfare costs.

The fact that plaintiffs were in a position to benefit more directly than certain other members of the public from performance of the contract does not alter their status as incidental beneficiaries. (See Rest., Contracts, § 145, illus. 1: C, a member of the public cannot recover for injury from B's failure to perform a contract with the United States to carry mail over a certain route.)[9] For example, in *City & County of San Francisco* v. *Western Air Lines, Inc., supra,* 204 Cal.App.2d 105, the agreement between the federal government and the city for improvement of the airport could be considered to be of greater benefit to air carriers using the airport than to many other members of the public. Nevertheless, Western, as an air carrier, was but an incidental, not an express, beneficiary of the agreement and therefore had no standing to enforce the contractual prohibition against

[8]Former section 2763 provided: "The purpose of this part is to establish special programs which (1) are directed to the solution of the critical problems existing in particular communities or neighborhoods (defined without regard to political or other subdivisions or boundaries) within those urban areas having especially large concentrations of low-income persons, and within those rural areas having substantial out-migration to eligible urban areas, and (2) are of sufficient size and scope to have an appreciable impact in such communities and neighborhoods in arresting tendencies toward dependency, chronic unemployment, and rising community tensions."

[9]This illustration is repeated in Tentative Drafts, Restatement Second of Contracts, section 145, illustration 1.

discrimination in the airport's availability for public use. The court explains the distinction as follows: "None of the documents under consideration confers on Western the rights of a third-party beneficiary. The various contracts and assurances created benefits and detriments as between only two parties—the United States and the City. Nothing in them shows any intent of the contracting parties to confer any benefit directly and expressly upon air carriers such as the defendant. It is true that air carriers, including Western, may be *incidentally* benefited by City's assurances in respect to nondiscriminatory treatment at the airport. They may also be incidentally benefited by the fact that, through federal aid, a public airport is improved with longer runways, brighter beacons, or larger loading ramps, or by the fact a new public airport is provided for a community without one. The various documents and agreements were part of a federal aid program directed to the promoting of a national transportation system. Provisions in such agreements, including the nondiscrimination clauses, were intended to advance such federal aims and not for the benefit of those who might be affected by the sponsor's failure to perform." (204 Cal. App.2d at p. 120.)

For the reasons above stated we hold that plaintiffs and the class they represent have no standing as third party beneficiaries to recover the damages sought in the complaint under either California law or the general contract principles which federal law applies to government contracts.[10]

The judgments of dismissal are affirmed.

McComb, J., Sullivan, J., and Clark, J., concurred.

**BURKE, J.**—I dissent. The certified hard-core unemployed of East Los Angeles were the express, not incidental, beneficiaries of the contracts in question and, therefore, have standing to enforce those contracts.

---

[10]In the absence of controlling provisions in the federal Constitution, statutes or regulations, the United States government's rights and obligations under its contracts are ordinarily construed according to general contract law rather than the law of any particular state. (*Priebe & Sons* v. *United States* (1947) 332 U.S. 407, 411 [92 L.Ed. 32, 38, 68 S.Ct. 123]; *Clearfield Trust Co.* v. *U. S.* (1943) 318 U.S. 363 [87 L.Ed. 838, 63 S.Ct. 573].) In disputes between private parties over conflicting claims stemming from United States government contracts, the applicability of federal law to particular issues is generally held to depend on the degree to which the outcome will affect the government's interests. (*Bank of America* v. *Parnell* (1956) 352 U.S. 29 [1 L.Ed.2d 93, 77 S.Ct. 119]; *United States* v. *Taylor* (5th Cir. 1964) 333 F.2d 633, 638; *American Pipe & Steel Corp.* v. *Firestone Tire & Rubber Co.* (9th Cir. 1961) 292 F.2d 640, 643.) In view of our holding it is unnecessary for us to decide whether or to what extent federal law applies in the present case.

As the majority point out, we must reverse the order sustaining the demurrer in this case if we determine the written contracts incorporated into the complaint support plaintiffs' claim either on their face or under any interpretation to which the contracts are reasonably susceptible (*ante,* pp. 399-400). Furthermore, at this stage of the proceedings, the question of plaintiffs' ability to prove these allegations does not concern us, for plaintiffs need only plead facts showing they may be entitled to some relief. (*Alcorn* v. *Anbro Engineering, Inc.,* 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].)

Civil Code section 1559 provides that "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." The general principles applicable to such contracts are set forth in *Shell* v. *Schmidt,* 126 Cal.App.2d 279, 290-291 [272 P.2d 82], as follows: "[A] third party beneficiary may maintain an action directly on such a contract. [Citation.] The promise in such a situation is treated as having been made directly to the third party. [Citation.] It is no objection to an action by the third party that the contracting party (here the government) could also sue upon the contract for the same breach. [Citation.] Of course, the beneficiary must be more than incidentally benefited by the contract. An incidental beneficiary cannot successfully maintain an action. [Citation.] Whether the beneficiary is or is not an incidental one, or a beneficiary for whose express benefit the contract was entered into, is a question of construction. [Citation.] It is not required that the third party beneficiary be specifically named as a beneficiary. All that section 1559 requires is that the contract be 'made expressly for the benefit of third parties,' and 'expressly' simply means 'in an express manner; in direct or unmistakable terms; explicitly; definitely; directly.' [Citation.] [¶] *Where the contract is for the benefit of a class any member or members of the intended class may enforce it.* [Citation.] *The fact that the government is one of the contracting parties does not change the rule.*" (Italics added.)

Applying the foregoing principles to the instant case I conclude that plaintiffs are express beneficiaries of the contracts between defendants and the government and are therefore entitled to enforce the contracts.

The majority contend that the congressional purpose in enacting the Economic Opportunity Act of 1964 (including the subsequent amendments thereto creating the Special Impact Program), and the government's purpose in executing the instant contracts with defendants pursuant to the act, was to benefit only the general public and particularly the local neighborhoods where these programs were to be implemented. Although mem-

bers of plaintiffs' class "were among those whom the Government intended to benefit . . . ," (*ante,* p. 401) the benefits accruing to plaintiffs' class, according to the majority, were merely "*means* of executing the public purposes stated in the contracts and in the underlying legislation." (*ante,* pp. 397-398, italics added.)

The majority err in the above conclusion because the congressional purpose was to benefit *both* the communities in which the impact programs are established *and* the individual impoverished persons in such communities.[1] The benefits from the instant contracts were to accrue directly to the members of plaintiffs' class, as a reading of the contracts clearly demonstrates.[2] These direct benefits to members of plaintiffs' class were not merely the "*means* of executing the public purposes" as the majority contend (*ante,* p. 397, italics added), but were the *ends* in themselves and one of the public purposes to which the legislation and subsequent contracts were addressed. Accordingly, I cannot agree with the majority that "the contracts here were designed *not* to benefit individuals as such but to utilize the training and employment of disadvantaged persons as a *means* of improving the East Los Angeles neighborhood." (*Ante,* p. 406, italics added.)

The intent of the contracts themselves is expressed in their preambles: "WHEREAS, the Secretary of Labor is authorized . . . to enter into contracts to provide for Special Impact Programs . . . directed to the solution of the critical problems existing in particular communities and neighborhoods within urban areas of the Nation having especially large concentrations of low-income persons; and [¶] WHEREAS, the President of the United States on October 2, 1967, launched a major test program to mobilize the resources of private industry and the Federal Government *to help find jobs and provide training for thousands of the Nation's hard-*

---

[1]Evidence of Congress' purpose to aid the *individual* impoverished persons in such communities can be gleaned from 42 United States Code Annotated section § 2701, wherein Congress declared that if our country is to achieve its full potential, "every individual" must be given "the opportunity for education and training, the opportunity to work, and the opportunity to live in decency and dignity." Congress implemented this general policy of assisting our impoverished citizens in various ways, including the Special Impact Program involved in this case. Yet, contrary to the majority, nothing indicates that Congress' *exclusive* purpose in doing so was to assist the neighborhoods and communities in which these persons live. It seems clear that Congress intended *both* the communities and the individuals to be direct beneficiaries of the program. It is incorrect to label one as an intended *direct* beneficiary and the other as merely *incidental.*

[2]In the contracts, the defendants agreed to provide training and jobs to a specified class of persons, whom plaintiffs represent. The government's express intent, therefore, was to confer a benefit, namely training and jobs, upon an ascertainable identifiable class and not simply the general public itself.

*core unemployed, or underemployed,* by inviting private industry throughout the country to join with the agencies and departments of the Federal Government in assuming responsibility *for providing training and work opportunities for such seriously disadvantaged persons.* [¶] Now THEREFORE, pursuant to the aforesaid statutory authority, and the directive of the President, the parties hereto, in consideration of the mutual promises herein expressed, agree as follows: . . . ." (Italics added.) By these provisions, the contracting parties clearly state as one of their purposes their intent to find jobs for the hard-core unemployed.

In accord with this expressed intent, the substantive provisions of the contracts confer a direct benefit upon the class seeking to enforce them. The contracts call for the hiring of stated numbers of hard-core unemployed from the East Los Angeles Special Impact Area for a period of at least one year at a starting minimum wage of $2.00 per hour for the first 90 days and a minimum wage of $2.25 per hour thereafter, or for the prevailing wage for the area, whichever is higher. In addition to requiring appropriate job training for such employees, the contracts also require "That the Contractor will arrange for the orderly promotion of persons so employed into available supervisory-managerial and other positions, and will arrange for all contract employees to obtain a total ownership interest not exceeding thirty (30) percent in the Contractor through an appropriate stock purchase plan . . . ." The scope of the stock purchase plans is detailed in each of the contracts.

In *Lucas* v. *Hamm,* 56 Cal.2d 583, 590 [15 Cal.Rptr. 821, 364 P.2d 685], we noted that one of the usual characteristics of a third party beneficiary contract is that performance is to be rendered directly to the beneficiary. The direct benefits to accrue to the beneficiaries as enumerated above renders inescapable the conclusion that these are third party beneficiary contracts.

Although the contracts may also benefit particular communities and neighborhoods, this fact does not preclude the maintenance of the action by plaintiffs as intended beneficiaries of the contracts. It is not necessary under Civil Code section 1559, *supra,* that a contract be exclusively for the benefit of a third party to give him a right to enforce its provisions. (*Hartman Ranch Co.* v. *Associated Oil Co.,* 10 Cal.2d 232, 247 [73 P.2d 1163]; *Ralph C. Sutro Co.* v. *Paramount,* 216 Cal.App.2d 433, 437 [31 Cal.Rptr. 174].) And, as will be discussed more fully, *infra,* nor does the existence of a liquidated damages clause running in favor of the government defeat plaintiffs' right to recover under the contract; the fact that the government may also bring an action for the same breach does not

bar the third party beneficiary from enforcing his rights. (*Shell* v. *Schmidt, supra,* 126 Cal.App.2d 279, 290.) All that is necessary is that the third party show he is a member of a class for whose benefit the contract was made. (*Shell* v. *Schmidt, supra; Ralph C. Sutro Co.* v. *Paramount, supra.*) Thus, plaintiffs have standing to bring an action for the breach of defendants' contracts with the government.

The majority, relying on Restatement of Contracts section 145, and *City & County of San Francisco* v. *Western Air Lines, Inc.,* 204 Cal.App. 2d 105, [22 Cal.Rptr. 216], contend that in the context of government contracts the intent to confer upon a third party a right of action against the promisor must be express; that intent "cannot be inferred simply from the fact that the third persons were intended to enjoy the benefits. . . ." (*Ante,* p. 401.) The majority insist that "The fact that plaintiffs were in a position to benefit more directly than certain other members of the public from performance of the contract does not alter their status as incidental beneficiaries." (*Ante,* p. 406.) The majority conclude (*ante,* p. 404) that "section 145 of the Restatement of Contracts does preclude [plaintiffs'] recovery because the services which the contracts required the defendants to perform *were* to be rendered to 'members of the public' within the meaning of that section." (Italics added by majority.)

· The majority's reliance on Restatement of Contracts section 145, and *City & County of San Francisco* v. *Western Air Lines, Inc., supra,* 204 Cal.App.2d 105, is misplaced. An analysis of section 145 of the Restatement (which also forms a part of the basis for the rule of *Western Air Lines* indicates that its provisions are not applicable to the case at hand. Section 145 provides in pertinent part that "A promisor bound to the United States or to a State or municipality by contract to do an act or render a service *to some or all of the members of the public,* is subject to no duty under the contract to *such members* to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless, (a) an intention is manifested . . . in the light of the circumstances surrounding its formation, that the promisor shall *compensate members of the public* for such injurious consequences. . . ." (Italics added.)

The express language of this provision indicates that it applies only to a promise to do an act or render a service to "some or all of the members of the public." The section deals solely with the promisor's duty to give compensation to "such" members of the public. The type of government contract to which section 145 applies is therefore distinguishable from the contracts in the instant case. Here, the contracts specify a particular class

of persons who are to receive a direct benefit. The beneficiaries of these contracts are to receive the promised performance because of their membership in a particularly defined and limited class and not simply because they are members of the public in general. Defendants are not bound to "do an act or render a service to some or all of the members of the public"; thus, by its own terms, section 145 of the Restatement is not applicable.

In addition, as indicated by comment a to section 145 of the Restatement, that section is merely a special application of the principles stated in Restatement section 133 which provides in part that "(1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is, . . . (a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary . . . ."[3] Section 135 of the Restatement makes such a contract enforceable by the donee beneficiary.[4]

The language of section 133, standing alone, could reasonably suggest that members of the general public are "donee beneficiaries" under any contract whose purpose is to confer a "gift" upon them. Section 145 qualifies this broad language and treats the general public merely as incidental, not direct, beneficiaries under contracts made for the general public benefit, unless the contract manifests a clear intent to compensate such members of the public in the event of a breach. Section 145 does not, however, entirely preclude application of the "donee beneficiary" concept to every government contract. Whenever, as in the instant case, such a contract expresses an intent to benefit directly a particular person or ascer-

---

[3] Comment c to section 133 of the Restatement of Contracts states in part that "By gift is meant primarily some performance or right which is not paid for by the recipient and which is apparently designed to benefit him." Thus, section 133 states essentially the same rule as that enunciated in *Shell* v. *Schmidt, supra,* 126 Cal.App. 2d 279, 290-291. Section 133 has been followed by the California courts. (*Hartman Ranch Co.* v. *Associated Oil Co., supra,* 10 Cal.2d 232, 244; *Southern Cal. Gas Co.* v. *ABC Construction Co.,* 204 Cal.App.2d 747, 752 [22 Cal.Rptr. 540].)

[4] Section 135 of the Restatement of Contracts, *supra,* provides: "Except as stated in § 140 [giving the promisor the protection against the third party beneficiary of any defenses he has against the promisee], (a) a gift promise in a contract creates a duty of the promisor to the donee beneficiary to perform the promise; and the duty can be enforced by the donee beneficiary for his own benefit; (b) a gift promise also creates a duty of the promisor to the promisee to render the promised performance to the donee beneficiary."

tainable class of persons, section 145 is, by its terms, inapplicable and the contract may be enforced by the beneficiaries pursuant to the general provisions of section 133. Thus, I would conclude that section 145 is consistent with the holding of *Shell* v. *Schmidt, supra,* 126 Cal.App.2d 279, and the *City & County of San Francisco* v. *Western Air Lines, Inc., supra,* 204 Cal.App.2d 105.[5]

In *City & County of San Francisco* v. *Western Air Lines, Inc., supra,* 204 Cal.App.2d 105, defendant airline was held to be merely an incidental beneficiary of contracts providing that an airport " 'will operate . . . for the use and benefit *of the public,* on fair and reasonable terms and without unjust discrimination.' " (P. 118, Italics added.) Nothing in the various contracts and assurances involved in the case "shows any intent of the contracting parties to confer any benefit directly and expressly upon air carriers such as the defendant." (P. 120.) The court stated that "To recover as a third-party beneficiary, one must show that the contract in question was made expressly for his benefit. [Citations.]" (P. 120.)

The rationale for the *Western Air Lines* rule is set out in *Ukiah* v. *Ukiah Water and Imp. Co.,* 142 Cal. 173, 180 [75 P. 773] [quoting from an earlier case] as follows, " 'The bar to such a recovery in each case is, that *the contract was not for the protection of any particular property or*

---

[5]The tentative draft of section 145 in Restatement Second of Contracts (The American Law Institute, Restatement of the Law Second, Contracts, Tentative Draft No. 3 [April 18, 1967], p. 76), also supports the conclusion that this provision of the Restatement does not bar plaintiffs' action. The tentative draft states: "In particular, a promisor who contracts with a government or governmental agency to *do an act for or render a service to the public* is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless (a) the terms of the promise provide for such liability; or (b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach." (Italics added.) Comment *a* to the draft of section 145 explains the rationale for the section in part as follows: "Subsection (2) applies to a particular class of contracts the classification of beneficiaries in § 133. Government contracts often benefit the public, *but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested."* (Italics added.)

Comment *c* to the tentative draft of section 145 states further that "Government contractors sometimes make explicit promises to pay damages to third persons, and such promises are enforced. If there is no explicit promise, and no government liability, *the question whether a particular claimant is an intended beneficiary is one of interpretation, depending on all the circumstances of the contract."* (Italics added.) Thus, under the tentative draft, section 145 is not an outright prohibition of the enforcement of governmental contracts by third parties absent the enumerated conditions. Comment *c* makes it clear that the question as to a particular claimant is one of interpretation, and that, where, as here, the contract manifests an intent to benefit a particular third party, liability is properly imposed upon the promisee in favor of such third party.

*person,* but was for the general benefit of all the property and persons within the municipal limits, and was entered into by the town as a public agency, solely for that purpose, and in the exercise of its power to furnish such general protection.' " (Italics added.)

Since in *Western Air Lines* the government contract at issue was not made expressly for the benefit of defendant but instead to benefit the general public, that case was correctly decided under Restatement of Contracts section 145. However, an interpretation to which the contracts in the instant case "are reasonably susceptible and which is pleaded in the complaint or could be pleaded by proper amendment" (*ante,* p. 400), in light of the legislative intent and the language of the contracts themselves, is that they were made expressly for the benefit of a particular class of persons, namely the class consisting of the certified hard-core unemployed of East Los Angeles.

*Western Air Lines* holds that a member of the general public cannot recover under a contract made for the public benefit unless there appears an intent in the contract that the promisor shall compensate the public for injuries caused by the promisor's performance or failure to perform. (204 Cal.App.2d at pp. 120-121.) That case does not stand for the proposition that an *express* beneficiary, or a class of express beneficiaries, may not enforce the contract unless it expressly declares that the parties so intended. On the contrary, under the rules set forth in *Shell* v. *Schmidt, supra,* 126 Cal.App.2d 279, 290-291, so long as the contract *expressly declares an intent to benefit a particular individual or class of persons,* such persons may enforce their rights under the contract notwithstanding the absence of a provision for damages for such beneficiaries in the event of breach. Therefore, the facts of the instant case are distinguishable from those of *Western Air Lines* and, furthermore, Restatement of Contracts section 145 is not applicable.

The majority contend that the inclusion of liquidated damage clauses in each of the contracts limits defendants' financial risks and was intended to preclude the assertion of third party claims. (*Ante,* p. 402.) Yet, these clauses simply provide for various refunds of monies advanced by the government in the event of a default. These so-called "liquidated damages" clauses nowhere purport to limit damages to the specified refunds. Nothing in the contracts limits the right of the government or, more importantly, plaintiffs' class, to seek additional relief. As I noted above, the fact that the government could also sue for breach of the contracts does not affect the rights of third party beneficiaries. (*Shell* v. *Schmidt, supra,* 126 Cal.App.2d 279, 290.)

The majority also rely on the fact that, "The present contracts manifest no intent that the defendants pay damages to compensate plaintiffs or other members of the public for their nonperformance." (*Ante,* p. 402.) Therefore, it assertedly follows that giving plaintiffs the right to monetary benefits in lieu of performance would give to plaintiffs and the class they represent benefits never contemplated nor intended under the contracts. This argument disregards both the fact that the class was to receive a direct monetary benefit under the contracts in the form of wages, and that under well settled contract law, an aggrieved party is entitled to be compensated for all the detriment proximately caused by a breach of contract (Civ. Code, § 3300).

A contract of employment ordinarily confers upon the employee the expectation that he will obtain the work bargained for. The measure of damages for the breach of such a contract, however, is not the award of the job, but is the amount of salary the employee would have earned for the agreed-upon period of service less the amount which the employer affirmatively proves the employee has earned, or with reasonable effort might have earned, from other employment. (*Parker* v. *Twentieth Century-Fox Film Corp.,* 3 Cal.3d 176, 181 [89 Cal.Rptr. 737, 474 P.2d 689, 44 A.L.R.3d 615].) Thus, the fact that plaintiffs' class has been promised only jobs and job training does not prevent them from recovering an amount of money which will compensate them for the loss of such jobs and training, i.e., the damages proximately caused by defendants' breach. (Civ. Code, § 3300, *supra.*)

It is my conclusion, therefore, that the trial court erred in sustaining the demurrer without leave to amend. I would order the trial court to determine the propriety of plaintiffs' class action prior to proceeding upon the merits of the complaint.

Tobriner, J., and Mosk, J., concurred.